L. S. MOORE, Retired Circuit Judge.
The appellant was indicted, tried, convicted and sentenced for the offense of assault with intent to murder. His punishment was fixed by the final judgment at imprisonment in the penitentiary for eight years. The indictment among other things charged that the appellant “did assault Floyd W. Cole, with intent to murder him.” Hence this appeal.
In substance the witnesses for the State testified as follows.
Floyd W. Cole testified that he lived in DeKalb County, Alabama; that Betty No-velle Cole was and is his wife; that he married her in November, 1975 and that she had previously been married to appellant; that she and appellant had three children, Billy, Bobby, and Alvin; that those children lived with him and their mother and were so living with him and his wife, their mother, on December 7,1975. He stated that on that date about 5:30 daylight time, the appellant came to his home; that appellant came in a car that was loud (made noise) and it awakened him and his wife and his wife went to the door and appellant was at the door. He stated that appellant said he wanted to see the children; that he was still in bed at that time, that his wife came back and asked him if it was all right and asked him to get up and to tell him. He said he got up and asked appellant, “You Bobby Gene?” and he said, “Yes,” and “I said ‘Come in.’ ” He said that was the first time he had ever seen the appellant. That he came in and woke the children up and told them their daddy was there to see them; that he turned around and saw appellant putting a gun in his back pocket, a black revolver with a short barrel; that when he first saw the gun appellant was letting the hammer down on the gun and putting it in his pocket; that he let the appellant visit with the boys; that appellant remained there five or ten minutes and left; that neither he nor his wife had any other conversation with appellant during that visit; that about five minutes after appellant left, he came back and said he broke his gearshift off and could not get it in gear; that he went out and helped him get it in gear and he left; there was a woman with him but she never came in the house and he did not know her.
He further testified that about five minutes later he came back and came into the house without invitation and without knocking on the door; that he asked the witness’s wife if he could have the boys and she told him no; that he (the witness) said, “Well, now he can. He can come see them at any reasonable hour and if he is not drinking." He stated that appellant then asked his wife when their divorce was final; that his wife got the divorce papers and the appellant jerked off his coat and threw it on the floor and said, “I’ll finalize it right now. I’ll kill you.” Mr. Cole stated that his wife stepped in between him and appellant and that he (Mr. Cole) shoved her, and just as he shoved her, appellant fired the shot; that he got the gun from his back pocket; that he fired a second shot which hit the wall; that the first shot hit the witness in the one leg going through that leg and into and out of the other leg. That when the first shot was fired, his wife made *801 a dive for the back bedroom; that after both shots were fired, the appellant ran out the door; that he, the witness, made a dive for the back room; that the witness went to the hospital and was treated there. He further testified the appellant was drinking when he came to the witness’s home on the occasion in question.
On cross-examination this witness drew a diagram of his home which was not introduced into evidence and with reference to that diagram gave the following testimony. We here quote from the record:
“Q. Would you just draw the outline of the house and rooms, please sir?
“A. It’s just simple. It’s, you might call it a three-room house. It’s made sort of like a square box, just a straight frame like that. You have a back bedroom here. You have a little partition that comes here for the kitchen, and this is the living room. We had the boys’ bunk beds here.
“Q. Would you show me where the road runs?
“A. The road runs, oh, I’d say 20 or 25 yards in front of the house. It’s the main road and I have a driveway coming from behind the house like this.
“Q. Where was Bobby Gene standing when he came back in?
“A. Would you mind repeating the question?
“Q. Where was Bobby Gene when he fired the shot?
“A. He was right here at the kitchen table kindly out from this partition. He was standing right here at the corner of the kitchen table, and I was standing here where the bunk beds was. There’s a chair. I got up out of this chair and there’s a couch here. And my wife was sitting on it and she got up and got the paper out of this end table right here. She walked over to show him when the divorce was finalized, and he jerked his coat off and throwed it. When he did I stepped here and shoved her out of the way.
“Q. Where’s the front door on this house?
“A. There’s one here. There’s one here at this back room door, and there’s one here.
“Q. Now, which door did Mr. Childress go out of after he fired the shots?
“A. Back door.”
This witness on direct examination had testified as above set out that appellant said, “I’ll finalize it right now. I’ll kill you.” On cross-examination with reference to the statement, “I’ll kill you”, we now again quote from the record:
“Q. Now you testified, I believe, that he came back in and after all this thing about the divorce and everything you said he said, ‘I’ll kill you.’ Was he talking to you at that time?
“A. Well, I can’t really say that for sure, sir. I believe he was talking to my wife.
“Q. You think he was talking to your wife. So, he said he was going to make the divorce final and said he would kill her, is that right?
“MR. IGOU: Object to that. He didn’t say he’d kill her. He said he didn’t know, object to it.
“THE COURT: Overruled.
“Q. So, he said ‘I’m going to make this divorce final. I’m going to kill you’ talking to your wife, is that right?
“A. He said ‘I’ll kill you’. That’s the exact words he said.
“Q. Then you testified that just before that he said ‘I’ll make this divorce final’?
“A. Yes sir.
“Q. He wasn’t going to make the divorce to you final, was he? He had to be talking to his wife, didn’t he? His ex-wife, your wife.
“A. I really don’t know who he was talking to.
“Q. All right, when he pulled out this gun who was standing in the line of fire?
“A. My wife.
“Q. Your wife. And you pushed her out of the way?
“A. Yes sir.
“Q. And then the shot hit you is that correct?
*802 “A. Yes sir.
“Q. And he had taken his coat off and thrown it on the floor, is that correct?
“A. Yes sir.
“Q. And he didn’t take his coat off until the third time?
“A. That’s right.
“Q. And he was carrying a gun in his back pocket?
“A. Yes.”
Betty Cole testified that she was the wife of Floyd Wayne Cole; that she had been married to appellant before she married Cole and she and appellant had three children. She stated that the children live with her and her present husband. She testified that on December 7,1975, appellant came to their house at about 4:00 a.m. slow time; that she got out of bed and went to the door; that appellant asked her if her husband was at home; that he wanted to see the children; that she asked her husband if it was all right to let him see the kids and he said “Yes.” She further stated that her husband dressed and went to the door and that appellant came into the house; that appellant was drinking and that he woke the kids up; that she saw appellant put a gun in his back pocket just after he came in the house; that the gun was a pistol and that appellant was there about fifteen minutes and left. This witness testified substantially as her husband did as to appellant coming back to the house a second time. This witness further testified that he came back a third time and just came on in the house; that he wanted to know if he could have the children; that she told him he could not take them off any more; that he wanted to know when their divorce became final. She stated that at that time she was sitting in a chair and Wayne was sitting on the arm of the chair; that appellant said, “You got a good woman there, be good to her,” and he said, “When did our divorce become final?” and the witness replied, “Just a minute and I’ll see” and that she went to a table and picked up the divorce papers and appellant was standing beside the bunk beds, coming into the living room, and that she was going to show him when the divorce became final. She said he wanted to know when the support payments started and she was going to tell him; that when she picked up the papers he pulled his jacket off and threw it on the floor and pulled the gun out of his pocket; that about that time Wayne got out of the chair and walked over to where she was and Bobby Gene pointed the gun at her and said, “When did the divorce become final?” and she said, “I’ll tell you,” and that the appellant said, “I’ll finalize the thing right now. I’ll just kill you.” She further testified that Wayne then shoved her and he shot Wayne; that two shots were fired; one struck Wayne and one struck the wall about an inch above her baby’s head; that appellant ran out the back door and she took her husband to the hospital. She stated that when the shots were fired, appellant and her husband were about three feet apart.
On cross-examination this witness further testified that the reason she was not hit was because her husband pushed her out of the way; that she was the one that was in the line of fire and was standing beside Wayne; that she was not between them; that the first shot wounded Wayne.
This witness was then shown the drawing which we heretofore mentioned and we here again quote the record of her testimony in that connection:
“Q. If you’ll turn around and look at this drawing behind you, was Bobby Gene standing about there and Wayne about there roughly?
“A. What’s those other shots represent?
“Q. I think that’s a table.
“A. All right, they weren’t there. Where were they?
“A. The table is back.
“Q. Which way?
“A. That’s the living room, right?
“Q. As I understand it, this is the living room, this is the kitchen, and this is the bedroom.
“A. Right here is where Bobby was standing. The bunk beds are over here.
“Q. So Bobby was standing here.
*803 “A. And Wayne was standing about right here.
“Q. And Wayne was standing there.
“A. I was standing right beside him.
“Q. You were standing there. Let’s move back so the Jury can see this. You say Bobby Gene was standing here. This is the bedroom right here.
“A. No, the bedroom’s right there. The bunk beds are in the living room.
“Q. That’s your bedroom.
“A. My bedroom’s right here.
“Q. All right, so this is Bobby Gene and this is Wayne, and this is you. He shoved you out of the way.
“A. Yes.
“Q. And he got hit?
“A. Yes.
“Q. Bobby Gene fired another shot, and your testimony is that Wayne ran past Bobby Gene into here, and Bobby Gene ran out the back door is that correct?
“A. Yes sir.”
The State at this point introduced evidence given by a nurse at the hospital as to the treatment given to Floyd Wayne Cole at the hospital. The State introduced into evidence a .38 caliber bullet found in the room where the shooting occurred after carefully following the chain of possession after it was found.
The State then rested.
Thereupon the appellant made a motion to exclude the evidence and dismiss the case of assault with intent to murder on the grounds the evidence does not show any intent on the part of the defendant to kill Wayne Cole, but may show he intended to kill Betty Cole and that the doctrine of transferred intent is not applicable in a case of assault with intent to murder; that if the real intent shown by the evidence is not that charged there can be no conviction; that for a conviction to be had the evidence must show an intent to kill the named victim and malice.
The motion was denied by the trial court.
The defendant testified in his own behalf and in substance his explanation of the events immediately surrounding the shooting was that he did not have a gun; that he did not say anything about finalizing the divorce or that “I’ll kill you.” He testified there was an argument about his having or seeing the children. He further testified that while the argument was going on, Wayne Cole jumped up and ran into the bedroom; that the next time he saw Cole he came running out of “this room right here” (referring to a diagram of the house drawn by his attorney) and “I was standing right over here; that Cole had a gun in his hand; that I grabbed him by the arm and knocked it sideways and the gun went off and I ran out the back door and from the way he acted, I thought Wayne Cole had been shot.”
The defendant offered other evidence but none of it related to the events that took place inside the house except his own testimony. He testified that he had previously lived in that house and had dropped a gun in it and it went off; that he never looked to see where the bullet went. This was an effort to explain the bullet hole in the wall that the State witnesses had testified about.
It is the contention of the appellant that the evidence in this case may have shown that the appellant had the intent to murder Betty Cole, but that the evidence fails to show that he had any intent to murder Floyd W. Cole and that before a conviction could be had the evidence must show that he assaulted Floyd W. Cole with the intent to murder him. The appellant argues that the doctrine of “transferred intent” does not apply to a charge of assault with intent to murder, although it does apply to a charge of murder.
The appellant cites in brief the case of Simpson v. State, 59 Ala. 1. In that opinion we find the following:
“If the intent was to murder another, or if there was not the specific intent to murder Ford, there can not be a conviction of the aggravated offence charged, though there may be of the minor offence of assault or of assault and battery.”
* * * * * *
“So, also, if there is the felonious intention to kill one, and the fatal blow falls *804 on another, causing death, it is murder. The act is referred to the felonious intent existing in the mind of the actor, and by implication of law supplies the place of malice to the person slain. (Citations omitted) The doctrine of an intent implied by law, different from the intent in fact, can have no application to the of-fences the statute punishes. It is excluded by the terms of the statute, which include only direct assaults on the person of the party it is averred there was the intent to murder. If in fact there was not the intent to murder him, whether there was a general felonious intent, or an intent to do harm to some other individual, is not important — there can be no conviction of the aggravated offence.”
In Simpson, supra, the facts may be briefly stated:
There had been repeated trespasses in the defendant’s garden. The defendant set a spring-gun in contact with a string attached to the gun. The defendant did not know who the trespassers were. One Ford came in contract with the string and was shot. The indictment charged the defendant with assault with intent to murder said Ford. This is not a case of shooting at one person with intent to kill him and injuring another. But apparently the case holds the same principle of law would apply.
In the case of Lawhon, Yarbrough and Yarbrough v. State, 41 Ala.App. 577, 141 So.2d 205, appears the following:
“The proof of the mens rea must show (1) intent to kill the named victim and (2) malice.”
In Rowlan v. State, 14 Ala.App. 17, 70 So. 953, the defendant requested the following written charges:
“I charge you that, unless you believe from the evidence and beyond a reasonable doubt that defendant intended to shoot Mr. Clayton, and not some other party, you cannot convict the defendant of an assault with intent to murder.” That charge was refused by the Court. The Court gave charge 3, as follows:
“Unless you believe from the evidence and beyond a reasonable doubt that defendant had the intention to kill Mr. Clayton in her mind at the time of the commission of the alleged assault upon him, you cannot find her guilty of an assault with intent to murder.”
After giving charge 3, the Court then of his own motion, said to the jury:
“I give you this charge, gentlemen, with the explanation that, if you believe she shot at someone else with the intent to kill that person, and the shot hit Mr. Clayton, she would be just as guilty as though she had been shooting at Mr. Clayton with the intent to kill hirn, and your verdict should be rendered accordingly.”
On appeal this Court said:
“While an unlawful act and a specific intent must concur to constitute the statutory offense of an assault with intent to murder, it is not essential that the intent be to murder any specific person. The offense is complete if the intent is to murder the person assaulted, although the assailant may not know who it was. The court was not in error in explaining written charge 3, nor in refusing 1, 2, 9, and 10.”
It clearly appears to the writer of this opinion that the judge’s explanation of charge 3 in Rowlan, supra, embraces the doctrine of “transferred intent.” To say the least there is a state of confusion as to the doctrine.
We have discussed this doctrine of “transferred intent” in assault with intent to murder charges because of the earnest insistence of counsel for appellant in brief filed in this Court that the only intent shown by the evidence on the part of the appellant was to kill Betty Cole and that said evidence does not show any intention on his part to murder Floyd Wayne Cole.
The doctrine of “transferred intent” was not applied by the trial judge in this case. In his oral charge to the jury he instructed the jury as follows:
*805 “If you are to find the defendant guilty of assault with intent to murder then you must be convinced beyond a reasonable doubt that on the occasion complained of the defendant assaulted Floyd W. Cole with the intent to murder him.”
The trial judge also gave the following charge as part of his oral charge but apparently at request of defendant although not so stated:
“I charge you ladies and gentlemen of the jury that unless you are satisfied beyond a reasonable doubt and to a moral certainty that the defendant had a specific intent to murder the prosecuting witness you cannot find the defendant guilty of assault with intent to murder.”
The real question in this case, now before us, is not whether the trial judge misapplied the law with reference to so-called doctrine of “transferred intent”, but whether there was evidence to justify the verdict of the jury to the effect that the appellant did assault Floyd W. Cole with intent to murder him. With that in mind we here point out some of the important facts shown by the evidence offered by the State. The defendant was armed with a pistol when he went to the Cole home; he was invited into the home by Cole, the man he later shot. He followed Floyd W. Cole into the children’s bedroom and when the said Cole looked back, he saw appellant had a gun in his hand and “he was letting the hammer down on it and was putting it into his pocket;” that appellant made three trips to that home in quick succession. The appellant told him he had a good wife. The appellant brought up the subject of when the divorce would be final and when the child support would begin. He was drinking when he went there the first time. Appellant admitted he had drunk two beers. A jury may use common sense. How many times do we and juries hear this “two beers” idea from defendant and even from friends. He was hostile and admitted getting into an argument in that home. Mrs. Betty Cole testified in substance that when the appellant first drew the pistol at the time of the shooting, she was in the line of fire and that her husband, Floyd Wayne Cole, was beside her. He was therefore not behind her and not in the line of fire at that time. There is no evidence that when her husband pushed her out of the way, that he stood where she had been standing. The appellant fired the first shot after she was pushed away. Not a single witness gave any evidence as to the expired time between when she was pushed out of the way and the firing of the first shot. The jury could well have determined that the appellant changed the direction the gun was pointed after she was pushed and with intent to murder Floyd W. Cole aimed the gun at and fired the gun at him.
It is true that the evidence would clearly support a finding that at one point of time appellant intended to murder Betty Cole, but it was also a jury question that at the time he fired the first shot he intended to murder Floyd W. Cole. There was other evidence in this ease that the jury saw and heard that is not completely revealed in this record. We refer to the diagram drawn and the evidence as quoted from the record about the positions of appellant and Floyd W. Cole and Betty Cole during the difficulty and other matter with reference to the diagram. The diagram was not introduced in evidence and we do not have it before us with markings on it to demonstrate such position or the locations of rooms in the home and the furniture and doors. The evidence shows that when appellant had the gun pointed at Betty Cole, Floyd W. Cole shoved her and the first shot was fired and that Betty made a dive for the back bedroom and then a second shot was fired and struck the wall. The jury could have determined that the second shot also was intentionally fired at Floyd W. Cole with intent to murder him. We have set out these relevant facts but we are not excluding all of the other evidence.
Considering these stated relevant facts as testified to by the witnesses for the State and considering them along with all the evidence in the case there was substantial evidence of the existence of every element of the offense charged and a jury question *806 was made out and the case was properly submitted to the jury and the verdict of the jury is justified by the evidence. We should not substitute this Court for the jury.
The rule in respect to the sufficiency of the evidence to justify overruling a motion to exclude the evidence and to support a verdict of guilty is stated in Sullivan v. State, 48 Ala.App. 347, 264 So.2d 576, as follows:
“There must be substantial evidence tending to prove all elements of the charged offense, a mere scintilla of evidence, in view of the presumption of innocence, being insufficient.”
Error cannot be predicated in the case before us on the trial court’s denial of the motion to exclude the evidence or the trial court’s refusal of the general charge.
The appellant requested the following charge which was refused by the trial court:
“7. I charge you ladies and gentlemen of the jury that if you find intoxication was such that defendant could not form the required specific intent then you must not find the defendant guilty of assault with intent to murder but must deliberate only on lesser included offenses.”
In Duncan v. State, 30 Ala.App. 356, 6 So.2d 450, certiorari denied, 242 Ala. 329, 6 So.2d 454, it is said:
“Of course if the charge was merely an abstract statement of the law — as to the evidence inapplicable — no error was made in its refusal.”
In George v. State, 240 Ala. 632, 200 So. 602, the Court said:
“Written charges numbered 10,15,17 and 18 were properly refused to defendant for the reasons they were abstract and inapt. There is no evidence to support the theory upon which they were based.”
There was no evidence that the appellant in the case before us at the time in question was intoxicated or drunk. The evidence was that he was drinking. He stated he had two beers. Said charge was for that reason correctly refused. It may also be said that it is confusing because it does not state who was intoxicated.
The other requested refused charges were either covered by the Court’s oral charge or were incorrect statements of the law.
We have searched the record in accordance with our duty for error and have found none justifying a reversal.
It is therefore ordered and adjudged by the Court that the judgment of the trial court be and is affirmed.
The foregoing opinion was prepared by Retired Circuit Judge L. S. Moore, serving as a judge of this Court under the provisions of Section 6.10 of the new Judicial Article (Constitutional Amendment No. 328); opinion is hereby adopted as that of the Court. The judgment is hereby
AFFIRMED.
All the JJ., concur, except BOWEN, J., who recuses himself.