373 So.2d 1254 (1979)
Geommery M. COLEMAN, alias
v.
STATE.
6 Div. 1.
Court of Criminal Appeals of Alabama.
August 21, 1979.
Joel L. Sogol, Tuscaloosa, for appellant.
*1255 Charles A. Graddick, Atty. Gen., and Thomas R. Allison, Asst. Atty. Gen., for the State, appellee.
BOOKOUT, Judge.
Assault with intent to murder; sentence: twenty years imprisonment.
Around 5:00 p. m. on May 21, 1977, the appellant along with Leon Latham, John and Ralph Hargress, Larry Williams, and Tom Jones gathered at Leon Latham's residence to shoot dice. Around 7:00 or 7:30 p. m., with a game in progress, Wattie Harris arrived. Shortly thereafter appellant lost $8 to John Hargress who was throwing the dice at the time. John Hargress did not have change for appellant's $20, and Wattie Harris told Ralph Hargress that he could make change. Appellant retorted that he was not in the game and did not have anything to do with it. An argument ensued between the two. Appellant and Harris were kneeling on the floor with the others in the game when the argument erupted. However, Harris stood and moved near the front door immediately after its initiation. The argument was short-lived as Leon Latham intervened as peacemaker, and no other words passed between the appellant and Harris. Approximately five to ten minutes later, John Hargress lost control of the dice ending the game, and the appellant went to use the bathroom. Within a few moments, appellant returned with a gun to the doorway leading from the living room where the game was being held. He began to fire in the direction of Harris and in the process shot both Harris and Tom Jones. Appellant was subsequently tried and convicted of assault with intent to murder Wattie Harris. He was sentenced to twenty years imprisonment, and that conviction was affirmed without opinion by this court on May 22, 1979. The instant case concerns the assault on Tom Jones.
At the close of the State's evidence, appellant made the following motion out of the presence of the jury:
"MR. SOGOL: Your Honor, at this time the State would movethe defense would move to exclude the State's evidence, in particular the defendant would move to exclude the State's evidence to the indictment charging assault with intent to murder on the ground that the State has failed to prove any intent on the part of Mr. Coleman to murder Mr. Tom Jones. The testimony is that the defendant was shooting at Mr. Wattie Harris. He shot at him and tracked him out of the room, so to speak, and followed him outside and shot him outside. We submit the State has failed to present any evidence of any intent to kill Tom Jones."
The trial court overruled the motion which challenged the sufficiency of the State's evidence on the essential element of intent. A more detailed recitation of the facts is therefore necessary.
Leon Latham testified in substance to the above recited facts. He also stated that he did not see anyone drinking at his house during the game. Additionally, he heard no threats from Harris directed toward the appellant. Latham further testified that when the appellant reappeared at the doorway leading to the bathroom, he saw a gun in appellant's hand which he fired in the direction of the front door where Wattie Harris was. In addition he stated that at this time no one else was around the front door. Tom Jones was not involved in the game and was seated on the couch in the living room where he had been throughout the argument. Latham testified that after the first shot was fired, Harris moved toward the couch. Latham then went into a bedroom, loaded his shotgun, and told the appellant to leave. He further stated that a short while later, after finding no one in the house, he went outside and saw the appellant standing beside his car, and he fired his shotgun in the air and told the appellant to leave.
John Hargress testified to the argument between appellant and Harris. He stated that when the argument began Harris stood and put his hands into his pockets, but he did not see or hear Harris threaten the appellant. Hargress stated that after he had lost control of the dice he got ready to leave and moved from the living room floor *1256 to the porch. He then moved to the front doorway when the first shot was fired. He testified that Tom Jones was on the couch at this time. Hargress then ran around the house, met his brother and Larry Williams, and went to his mother's house nearby. Shortly thereafter he drove by Latham's house and saw Tom Jones holding his chest where he had been shot. He carried him to the hospital. Hargress testified that he had not been drinking that evening and did not smell alcohol on anyone's breath.
Ralph Hargress also testified concerning the argument between appellant and Harris. In addition, he stated that Tom Jones was sitting on the couch with Larry Williams when appellant shot toward the front doorway. Hargress testified that he was standing in the doorway where appellant was and that appellant fired twice across his chest. He stated that he grabbed appellant's arm, but appellant told him to get back. Hargress testified that Tom Jones was sitting on the couch and within touching distance of the doorway where he was standing and that appellant fired his gun toward the front doorway. After he left the house and met his brother and Larry Williams, Ralph Hargress went to his mother's house. Shortly thereafter he drove by Latham's, saw Tom Jones injured, and carried him to the hospital.
Larry Williams testified to the argument between appellant and Harris. He stated that Tom Jones and he were on the couch at this time. Williams stated that he saw the appellant with a gun and saw it fired toward the front door. He recalled that when the shooting began, he headed from the couch toward the front door and Wattie Harris headed in exactly the opposite direction. Williams testified that when the shooting began, Tom Jones remained on the couch.
Wattie Harris testified as to his argument with the appellant and stated that he did not enter the game that evening. He stated that he was not mad at the appellant. Harris further testified that after the appellant had left the living room to use the bathroom he saw appellant with a gun pointed at him. Harris was very near the front door squatting down. When appellant began to shoot at him, Harris stated that he could not get out of the front door because it was crowded so he ran toward the couch where Tom Jones was seated. Harris testified that the third shot hit him in the hand. He recalled that when Leon Latham told the appellant to leave he ran out of the house and jumped off the front porch. Harris was then shot again in the hip, however, he does not know who hit him. Harris heard a shotgun discharge after he had crawled to the back of the house. He further testified that he was not armed that evening, and the only person he saw with a gun was the appellant.
Tom Jones testified that he was sitting on the couch when the argument erupted and remained there throughout the shooting. He stated that when the shooting began Wattie Harris moved toward him. Subsequently, Jones was shot in the chest. Jones testified that he was not paying much attention to the argument, did not see the appellant with a gun, and did not have anything to drink while at Latham's. After everyone had left the house, Jones exited and was subsequently carried to the hospital by the Hargresses.

I
Pursuant to § 13-1-46, Code of Ala. 1975, the offense consists of (1) an assault and (2) an intent to murder the named victim. Lawhon v. State, 41 Ala.App. 577, 141 So.2d 205 (1962). Consequently, the offense requires proof of specific intent to murder the person named in the indictment. Rogers v. State, 23 Ala.App. 149, 122 So. 308 (1929).
From the evidence, it is clear that appellant did not at the time Jones was shot possess the requisite intent to murder him. Jones was merely a passive spectator to the incident. Appellant's actions were not directed toward him, but were directed toward Harris. Although the evidence does not have to show with crystal clarity that the appellant was aiming with expert precision at Tom Jones, taken as a whole, the *1257 evidence must permit a reasonable factual conclusion that appellant was shooting at Tom Jones in particular with the intent to murder him. Such a conclusion is totally unsupported by the evidence in this case.
In Simpson v. State, 59 Ala. 1 (1877) at 9, discussing the crime of assault with intent to murder, the Supreme Court stated:
"... The offence charged must be proved, and an essential element of the present offence is not only an assault with intent to murder, but the specific intent to murder Ford, the person named in the indictment. If the intent was to murder another, or if there was not the specific intent to murder Ford, there can not be a conviction of the aggravated offence charged, though there may be of the minor offense of assault, or of assault and battery. ..." (Citations omitted.)
Furthermore, at 12, that Court said:
"... The true principal is, that the particular intent, the intent to murder the person assailed is [a] matter of fact, about which the law raises no presumptions, and indulges no inferences...." (Citations omitted.)
Simply put, the doctrine of transferred intent has no application to the offense of assault with intent to murder. Consequently, a general felonious intent, by implication of law, which will convert the killing of a human being into murder though his death was not the intent of the perpetrator has no application to the instant offense. The Supreme Court stated in Simpson, supra, at 18:
"... It is excluded by the terms of the statute, which include only direct assaults on the person of the party it is averred there was the intent to murder. If in fact there was not the intent to murder him, whether there was a general felonious intent, or an intent to do harm to some other individual, is not importantthere can be no conviction of the aggravated offence...." (Citations omitted.)
See also: Crear v. State, Ala.Cr.App., [Ms. July 17, 1979]; Sparks v. State, 261 Ala. 2, 75 So.2d 103, reversing, 37 Ala.App. 631, 75 So.2d 96 (1953); State v. Mulhall, 199 Mo. 202, 97 S.W. 583 (1906); State v. Williamson, 203 Mo. 591, 102 S.W. 519 (1907); Lacefield v. State, 34 Ark. 275 (1879); Ragar v. State, 180 Ark. 1131, 24 S.W.2d 334 (1930); Barcus v. State, 49 Miss. 17 (1873); McGehee v. State, 62 Miss. 772 (1885), and cases cited therein; 6 Am. Jur.2d, Assault and Battery, § 52 (1963); 40 Am.Jur.2d, Homicide, §§ 570, 572 (1968); 40 C.J.S. Homicide § 81 (1944). Consequently, the evidence was insufficient to submit to the jury.

II
Having determined that appellant's conviction cannot stand, we must further decide whether or not the double jeopardy clause of the Fifth Amendment to the United States Constitution (as applied to the states through the Fourteenth Amendment) bars a subsequent prosecution on the lesser included offenses of simple assault or assault and battery.
An indictment charging assault with intent to murder also embraces the lesser offenses of simple assault and assault and battery. Wilson v. State, 53 Ala.App. 653, 303 So.2d 153 (1974); Simpson, supra, at 9. A judgment of conviction is a bar to further prosecution that was or could have been embraced within the charge upon which the conviction was laid. Nunley v. United States, 339 F.2d 442 (10th Cir. 1964); United States v. Henry, 504 F.2d 1335 (10th Cir. 1974). Furthermore, in Gray v. United States, 14 F.2d 366, 368 (8th Cir. 1926), it was stated:
"... although a single act may constitute separate offenses, only one prosecution may be sustained, for the reason that the lesser offense is merged into the greater."
See also: Miller v. United States, 300 F. 529 (6th Cir. 1924), cert. denied, 266 U.S. 624, 45 S.Ct. 123, 69 L.Ed. 474 (1924); United States v. Olmstead, 5 F.2d 712 (W.D.Wash. 1925); Wharton's Criminal Procedure, § 580 (12th ed. 1976).
*1258 In Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 51 L.Ed.2d 187 (1977), the rule was reaffirmed that one convicted of a greater offense may not be prosecuted subsequently on a lesser included offense since this would be the equivalent of two trials for "the same offense." See also: In re Nielsen, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889); Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977).
In Burks v. United States, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978), the United States Supreme Court, in dealing with the question of whether or not the double jeopardy clause precludes a retrial on the same offense after reversal of the conviction once the reviewing court has found the evidence insufficient to support the jury verdict, stated:
"The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials. The Clause does not allow `the State ... to make repeated attempts to convict an individual for an alleged offense,' since `the constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.' ..." (Citations omitted.)
Further, in discussing reversals based upon trial error and insufficiency of the evidence, the court noted that:
"Various rationales have been advanced to support the policy of allowing retrial to correct trial error, but in our view the most reasonable justification is that advanced by Tateo, supra, 377 U.S., at 466, 84 S.Ct., at 1589:
`It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.'
"... In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e. g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished....
"The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble. Moreover, such an appellate reversal means that the Government's case was so lacking that it should not have even been submitted to the jury. Since we necessarily afford absolute finality to a jury's verdict of acquittalno matter how erroneous its decisionit is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty." (Citations omitted.)
See also: Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); Crist v. Bretz, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978).
From the above discussion, it is clear that appellant cannot be retried on any charge which stemmed from the crime for which he was indicted. The trial court could have submitted the case to the jury on the lesser included offenses and removed from their consideration the charge of assault with intent to murder. Since this was not done, the appellant will go unpunished on the instant charge. However, he will not go free as he is still under a twenty year sentence on the assault against Harris.
*1259 For the reasons hereinabove set out, the instant conviction must be reversed and on mandate of Burks, supra, must also be rendered.
REVERSED AND RENDERED.
All the Judges concur except DeCARLO, J., dissents.
DeCARLO, Judge, dissenting.
This court, in an opinion written by L. S. Moore, Retired Circuit Judge, Childress v. State, Ala.Cr.App., 344 So.2d 799, affirmed a case whose facts closely parallel those under review in the present case. The facts in Childress show that, on the evening of the assault, Childress had gone to his former wife's residence on three occasions, several minutes apart. On returning the third time the appellant asked his former wife and her current husband, who was present, when their divorce was to become final.
The former wife, Betty Cole, testified that, when she picked up the papers to show them to Childress, he pulled a gun from his pocket. About the same time, her husband, Floyd Cole, got out of a chair and walked over to her.
The appellant pointed the gun at her and said "when did the divorce become final?" She said, "I'll tell you," and the appellant said, "I'll finalize the thing right now, I'll just kill you." She testified that, at that point, her husband shoved her away and Childress shot him. She said that two shots were fired, one of which struck Floyd Cole, her husband, and one struck the wall.
In Childress, supra, this court stated:
"The evidence shows that when appellant had the gun pointed at Betty Cole, Floyd W. Cole shoved her and the first shot was fired and that Betty made a dive for the back bedroom and then a second shot was fired and struck the wall."
The court went on to note that, "[t]he jury could have determined that the second shot also was intentionally fired at Floyd W. Cole with intent to murder him. We have set out these relevant facts but we are not excluding all of the other evidence."
It was the court's opinion that "[t]he real question in this case ... is not whether the trial judge misapplied the law with reference to so-called doctrine of `transferred intent', but whether there was evidence to justify the verdict of the jury to the effect that the appellant did assault Floyd W. Cole with intent to murder him."
In Childress, supra, there was no evidence that Floyd Cole was in the line of fire when the appellant began firing at Mrs. Cole, nor was there any evidence in the present case that Tom Jones was in the line of fire when Geommery Coleman, the appellant, began shooting at Wattie Harris, or when he was struck by the bullet. However, there is some evidence that Harris "ran toward where Tom Jones was seated" after the first shot was fired, but no evidence was offered that he was in front of, or even beside Jones when Jones was shot.
In view of the decision in Childress v. State, supra, it is my judgment that it was reasonable for the jury, in the present case, to find that the appellant, Coleman, shot Jones with the intent to murder him. Therefore, under the rationale in Childress, there was no error in submitting the case to the jury and the case should be affirmed.