[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 139 
Lewis Lamar Free was indicted on one charge of murder and twelve charges of attempted murder. The thirteen cases were consolidated for trial and the jury found the appellant "guilty as charged" in each indictment. The trial judge sentenced the appellant to six "life terms" in the penitentiary.
On the morning of November 20, 1981, J.D. White, the warden at Holman prison, saw the appellant park his blue and white pickup truck beside Highway 21 near Wet Weather Creek Bridge. The bridge is located north of Atmore and just south of Holman prison and G.K. Fountain Correctional Center.
At approximately 9:30 a.m., Sherman Sanks and his wife, Merle, were traveling south on Highway 21. As their vehicle approached the bridge, the Sanks saw the appellant standing beside his truck pointing a gun directly at their vehicle. The appellant fired a shot which hit the lip of the hood on the Sanks' vehicle.
John Shook and his wife, Nellie, were proceeding north on Highway 21 as they approached the bridge. After they had passed the appellant standing beside the road, the Shooks' heard what sounded like an "explosion". The rear windshield of their vehicle was shattered and the front windshield had a hole in it. The bullet the appellant shot into the Shooks' vehicle skinned the top of Mrs. Shook's ear.
The next vehicle to pass by the appellant was driven by Glenn Williams. The passengers in this north bound vehicle were Glenn Williams' wife, Ann (who was sitting on the passenger side of the front seat), Williams' niece, Teresa Blair (who was sitting in the left rear seat), Williams' mother, Myrtle (who was sitting in the center rear seat), Williams' sister, Bernice Harvill (who was sitting in the right rear seat) and Williams' great niece, Candida Harvill (who was sitting in Bernice Harville's lap). As their vehicle approached the appellant, Glenn and Ann Williams noticed the appellant was holding a gun. Once their vehicle had passed the appellant, Ann Williams told her husband she thought the appellant was going to shoot. Glenn Williams instructed everyone to duck. An instant later the appellant shot through the windshield of their vehicle. The bullet struck and killed Bernice Harvill.
As Robert Moye drove south on Highway 21 toward the bridge, he saw the appellant aiming his gun at him. Moye, realizing the appellant might shoot, laid down in the seat until his vehicle had passed the appellant. Then Moye looked in his rear view mirror and observed the appellant doing something to the gun. A few seconds later, Moye heard a shot but neither he nor his vehicle was struck.
Sherry Morris was traveling south on Highway 21 as she approached the appellant near the bridge. When she saw the appellant, he was aiming a gun at her and she laid down in the floorboard of her vehicle. Morris then heard a shot but it did not hit her vehicle.
Around 9:40 a.m., McArthur Davis, an investigator for the Department of Corrections, was at his office at Fountain Correctional Center when he overheard a radio conversation about gunfire at Wet Weather Creek Bridge and the need for an ambulance. Davis left and drove to the scene on Highway 21. Davis saw the appellant's truck parked near the bridge, so he parked his vehicle approximately 140 yards away.
Seconds later, a shot rang out which hit the hood of Davis' vehicle. Davis lay down in the front seat just as he heard another shot. All that Davis could see was the barrel of a gun protruding from the corner of the window of the appellant's truck. A third shot hit and shattered the left front headlight of Davis' vehicle.
At this point, Davis got out of his vehicle. Several shots were then exchanged between Davis and the appellant over a period of fifteen minutes. Davis instructed the appellant to exit the truck which he declined to do. Several Department of Corrections officials and Atmore police officers finally subdued the appellant who was lying in the floorboard of the truck. In and *Page 141 
around the truck, the police found a .30-.30 lever action rifle, an empty twenty shell box of ammunition, nineteen spent hulls and one bent round of ammunition.
An autopsy was performed on the body of Bernice Harvill and the cause of death was determined to be a gunshot wound to the head. The rifle found in the appellant's truck, which the appellant had purchased in October of 1981, was determined to be the rifle which fired the bullet which killed Bernice Harvill, and the rifle which fired the spent ammunition found in and around this appellant's truck.
 I A
The appellant, citing Estelle v. Smith, 451 U.S. 454,101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), contends that the trial court exceeded its authority by ordering an inquiry into the appellant's sanity at the time of the commission of the crimes. We do not agree with this contention for two reasons.
First, on March 30, 1982, at arraignment, the appellant pled not guilty by reason of insanity in each case. Certainly, the appellant's sanity, at the time of these offenses, was placed at issue, and was therefore the subject of proper inquiry, once the appellant entered his pleas of not guilty by reason of insanity.
Secondly, on April 27, 1982, defense counsel filed a motion with the trial court stating ". . . that the Defendant is presently insane and has been before and since the commission of the crime for which he is charged" and requesting an inquiry be held to ascertain ". . . whether he is sane or insane." (R. 522) (Emphasis added).
The language contained in defense counsel's motion clearly indicates the appellant's sanity at the time of these crimes was placed in question. It is clear to this court that when the trial court ordered a "complete mental evaluation . . . to determine whether or not this Defendant is presently insane, was insane on the date of the crimes alleged to have been committed by him and whether or not this Defendant is now competent to stand trial for said criminal acts," he was merely granting defense counsel's motion and giving him what he had requested. (R. 524). We are further convinced this is true because defense counsel never objected to the trial court's order.
Therefore, the trial court properly ordered an evaluation of the appellant's sanity at the time of the commission of these offenses.
 I B
Prior to trial, defense counsel filed a motion in limine to prohibit the prosecution from introducing evidence of psychiatric or psychological evaluations of the appellant due to the fact he was invoking his privilege of confidentiality as provided in § 34-26-2, Code of Alabama 1975. The trial court denied this motion and appellant claims this to be reversible error.
The prosecution in its case-in-chief did not attempt to present any evidence or testimony concerning the subject of the motion in limine. It was the appellant in his case-in-chief who first brought out evidence of these evaluations during the testimony of Dr. DeFrancisco. Then on rebuttal, the prosecution introduced the testimony of Dr. Salillas concerning these evaluations.
This issue was discussed and decided by this court in Magwoodv. State, 426 So.2d 918 (Ala.Cr.App. 1982). In that opinion, Judge Barron wrote:
 "We hold that by actively pursuing an insanity defense and introducing the deposition of Dr. Rudder as a defense witness, appellant waived any potential psychotherapist-patient privilege or privilege against self-incrimination against the subsequent testimony of Dr. McKeown on rebuttal.
 `As the Court of Criminal Appeals notes in its opinion, there are states which hold that by pleading insanity, a criminal defendant waives his *Page 142 
statutory privilege against disclosure of a `psychotherapist-patient communication.' The better reasoned cases hold, however, that there must be some presentation of evidence of insanity in addition to the plea, in order for the question of `waiver' to arise. . . .' Ex parte Day 378 So.2d 1159 (Ala. 1979), at p. 1162.
 "To hold otherwise would be to allow appellant to call all those psychotherapists or psychiatrists, who examined appellant under State order, he desired. Then, on a claim of privilege, appellant would be able to prevent the State from calling experts who examined him for the same purpose on rebuttal to refute the appellant's defense. Ex parte Day, supra; Estelle, supra, and cases cited therein."
Magwood, supra at 927.
Since the appellant's counsel initiated the inquiry into the appellant's sanity, appellant waived any privilege of confidentiality he may otherwise have had. Therefore, it is unnecessary for us to decide whether the trial court's decision to deny appellant's motion in limine was error.
 II
At approximately 5:00 p.m. on the day of the appellant's arrest, Officers Ronnie Cribbs and James Dixon went to the appellant's cell. He was asleep and someone awakened him. The officers advised him of his Miranda rights which he indicated that he understood. The waiver of rights was read to the appellant which he signed. At this point, the appellant gave a statement which was reduced to writing by Officer Cribbs. No threats, coercion, offer of reward or other inducements were made in order to obtain his statement. Cribbs read the statement back to the appellant and gave it to him to read. The appellant then signed the statement.
The appellant contends the State did not prove his confession was voluntary because the officers did not know the appellant's blood alcohol content at the time the statement was taken or if medication had been administered to him on the day his statement was taken. The only evidence the appellant presents in support of this contention is that the appellant's blood alcohol content was .15 at 10:30 that morning and that medication might have been given to him that morning at the hospital due to his injury he incurred during the exchange of gunfire with the officers who subdued him.
 "In order for intoxication to render a confession involuntary and inadmissible, it must be shown that the mind would have been substantially impaired. See Palmer v. State, 401 So.2d 266, 267 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala. 1981); Tice v. State, 386 So.2d 1180 (Ala.Cr.App.), cert. denied, Ex parte Tice, 386 So.2d 1187 (Ala. 1980)."
Moore v. State, 415 So.2d 1210, 1214 (Ala.Cr.App.), cert. denied, 415 So.2d 1210 (Ala. 1982).
The appellant did not present any evidence as to his blood alcohol content when the statement was taken or what effect the measurement taken at 10:30 a.m. would have on him at 5:00 p.m. that same day. Nor did he present any evidence that he had been given any medication that day. In fact, the officers stated they did not smell the alcohol and that the appellant did not appear to be intoxicated.
 "`The voluntariness of a confession, authorizing its admission into evidence, must be determined by the trial judge in the exercise of enlightened discretion . . .' Burks v. State, 353 So.2d 539
(Ala.Cr.App. 1977). When conflicting evidence is presented concerning the facts and circumstances surrounding a confession, the trial judge must decide on its admissibility. Hobbs v. State, 401 So.2d 276
(Ala.Cr.App. 1981). The trial court's decision will not be overturned on appeal unless it appears to be palpably contrary to the great weight of evidence or is manifestly wrong. Burks v. State, supra."
Womack v. State, 435 So.2d 754, 761 (Ala.Cr.App.), affirmed,Ex parte Womack, 435 So.2d 766 (Ala. 1983). *Page 143 
The trial judge, at a hearing outside the presence of the jury, decided the appellant's statement was voluntarily given and allowed the jury to determine its credibility. Based on the totality of the circumstances, we are of the opinion that the trial judge did not abuse his discretion in making this decision. Shewey v. State, 48 Ala. App. 730, 267 So.2d 520
(1972); Bills v. State, 49 Ala. App. 726, 275 So.2d 706 (1973);Hegmon v. State, 50 Ala. App. 486, 280 So.2d 192 (1973).
 III
During the direct examination of the appellant, the following occurred:
 "Q. Mr. Free, on the morning of November 20th was it your intent to kill Bernice Harvill?
 "MR. HART: Judge, we object to that that's invading the province of the jury.
"THE COURT: I sustain the objection.
 "MR. BYRD: Your Honor, we would like to make an offer of proof on that point that the cases are legion that the defendant in a criminal prosecution can testify to his mental state.
 "MR. HART: Judge, that's not what they asked him. Not only is it invading the province of the jury, it's a self-serving statement and it's not admissible for a man to testify what his intent was.
 "THE COURT: Where are some of the cases you are quoting. You got McElroy right there.
 "MR. BYRD: Give me fifteen minutes and I'll show them to you, Judge.
 "THE COURT: All right, let's see them. (Defense counsel leave the courtroom and thereafter return.) (2:55 p.m.)
 "THE COURT: Mr. Byrd, McElroy says: `Alabama, for over one hundred years, followed a rule that a witness could not testify to his own intent, motive, reason, belief, or the like, even though the witness' intent was material and relevant.' And they go down here in a subheading, they refer you to a case, where it says: `A witness could not testify on direct examination whether he, on trial for murder, intended to shoot anyone when he went for a rifle.'
 "MR. BYRD: That's been overruled, Judge, but I can't find it.
 "THE COURT: And I have found no law saying that's overruled.
"MR. BYRD: What section was that?
 "THE COURT: That's 102.07 (2) of McElroy on Evidence. All right, let's go on gentlemen. They criticize the rule but they haven't abandoned it.
 "MR. STOKES: That's all we have to ask at the present time.
 "THE COURT: All right. All right, Mr. Hart, you may cross." (R. 248-249)
Then, on redirect examination, the following took place.
 "Q. I show you that picture right there of Bernice Harvill. I'll ask you this question: Did you intend to kill Bernice Harvill —
"MR. HART: Judge, —
"Q. — with your rifle?
"A. No, sir.
 "MR. HART: I object to that, Your Honor. I object to that question. It calls for conclusion, invades the province of the jury and he's not qualified to testify to his own intent.
 "THE COURT: Mr. Hart, I hate to tell you but the appellate courts of Alabama have ruled to the contrary. They have changed the rule in Alabama. And they have specifically held he is entitled to state what his intent was. I overrule the objection." (R. 261)
If the trial court had not allowed the appellant to testify as to his intent, reversible error would have been committed as the appellant alleges. Morris v. State, 405 So.2d 81
(Ala.Cr.App. 1981); Starr v. Starr, 293 Ala. 204, 301 So.2d 78
(1974). However, once this error had been brought to the attention of the trial court, he cured this error by allowing the appellant to testify on this subject. Therefore, *Page 144 
there is no basis for error to reversal here shown.
Further, the appellant contends that the trial court's remarks to the prosecution when he was overruling the objection, prejudiced the appellant to the extent a reversal is mandated. We do not agree that the appellant was so prejudiced. Moreover, the appellant failed to object to this remark so as to preserve this issue for review. Rule 45 A.R.A.P.
 IV
The appellant contends that the testimony of witness David Gafford concerning the reputation of the appellant was improperly excluded. We do not agree. The pertinent portion of the record follows.
 "Q. You don't even know where he lived. Do you know where he lived the year before November of '81?
 "A. He was — I suppose he was living in Mississippi. I don't know.
"Q. You don't even know where he lived; do you?
"A. No.
"Q. What about two years before November '81?
"A. I don't know where he lived.
 "Q. You don't know anything about his reputation in the community because you didn't live in the same community with him during that time; did you?
"A. Well, for the last few years, no.
"Q. All right, sir.
 "MR. HART: Judge, we would ask the court to exclude any testimony this witness has given concerning any general reputation because he's admitted he didn't live in the community with him.
 "THE COURT: I am going to instruct the jury to disregard his testimony about the reputation of the man. What is relevant is reputation in the community where he lived." (R. 290)
This testimony clearly indicates Gafford did not have knowledge of the appellant's reputation in the community during the relevant time period, i.e., at the time when the offenses were committed. See C. Gamble, McElroy's Alabama Evidence § 26.02 (5), (6), (7) (3d ed. 1977).
Moreover, the appellant did not object to the exclusion of this evidence nor except to the trial court's ruling. There is no adverse ruling. Therefore, this issue is not preserved for review. Jennings v. State, 439 So.2d 771 (Ala.Cr.App.), cert. denied, 439 So.2d 771 (Ala. 1983).
 V A "As a general proposition, evidence of the conduct of a person whose mental capacity is in issue is admissible whether such conduct or condition occurs at, near, prior, or subsequent to the time in issue. It is commonly said that, upon the issue of mental capacity, wide latitude must be allowed all parties in making proof. We have statements to the effect that every act of a person's life is relevant to the issue of his mental capacity. However, it is generally agreed that this "every act" rule must be understood to carry the necessary limitation that the acts inquired about must throw some light upon the question of mental capacity existing at the time in issue.
 "The courts have adhered to the wide latitude rule relating to the admissibility of the conduct and condition of a criminally accused offered in support of his plea of insanity. This wide latitude has encompassed many forms of conduct and conditions which the trial courts have held are relevant to show his mental incapacity at the time in issue." (Footnotes omitted).
C. Gamble, McElroy's Alabama Evidence § 61.01 (6), (7), (3d ed. 1977).
The appellant cites several instances in which he was prevented from presenting evidence to support his plea of not guilty by reason of insanity.
First, appellant complains the trial judge limited testimony concerning his suicide attempt. A review of the record reveals such *Page 145 
was not the case. The appellant was allowed to testify in great detail about his attempted suicide.
 B
The second instance occurred during the testimony of David Gafford. The pertinent portion of Gafford's testimony is as follows:
 "Q. All right. I'll ask you this question: Are you familiar with the fact that other members of his family have had mental problems?
"MR. HART: Judge, we object.
"THE WITNESS: Yes, sir.
"THE COURT: I sustain the objection.
 "Q. (MR. BYRD): Can you tell the jury what other members of his family had mental problems?
"MR. HART: Judge, we object.
 "THE COURT: I sustain the objection to whether other members of his family had mental problems.
 "Q. (MR. BYRD): Do you know of your own personal knowledge if the family had problems?
"A. Yes, sir.
"MR. HART: Judge, we object to that question.
"THE COURT: I sustain the objection." (R. 288).
In Russell v. State, 201 Ala. 572, 78 So. 916 (1918), it was held to be error not to allow the appellant to present evidence of the insanity of blood relatives if the mental capacity of the appellant was at issue. In that opinion, Chief Justice Anderson wrote:
 "When the sanity of the person is being investigated and determined, and there is other proof tending to establish the mental incapacity of said person, it is competent to show in connection therewith the insanity of his ancestors or other blood relatives."
Russell, supra at 573, 78 So. 916.
Gafford testified he was a Church of Christ minister in Greenville and also owned a store there. He stated he had known the appellant and his family for many years. Gafford demonstrated he had sufficient knowledge of the family to give an opinion as to the mental competency of certain members of the family. Even though a proper foundation had been laid, Gafford was not allowed to testify regarding this matter. Gafford should have been allowed to testify as to his opinion as to the mental competency of certain members of the appellant's family. Therefore, the trial court's refusal to allow this matter is reversible error.
 C
Another instance of which the appellant complains is demonstrated in the following excerpt from the record:
 "Q. All right. At that time were you married or were you single?
 "A. I was . . . I was single. I been living with this Shirley McCullough.
"Q. Was she pregnant or not?
"A. Yes, she was.
"Q. With your child?
"A. Yes, sir.
"Q. And did you all have some trouble that night?
"A. Yes, sir.
"MR. HART: Judge, we object to what —
 "THE COURT: I sustain the objection to any trouble he had with his wife the night before all this happened. This is on the 19th, I think, Mr. Stokes.
 "MR. STOKES: Yes, sir, this is the 19th. Less than twelve hours, Judge.
"THE COURT: I sustain the objection.
 "MR. BYRD: Judge, we want to make an offer of proof in the record on that to preserve the record as to what he would say.
"THE COURT: Out of the presence of the jury?
"MR. BYRD: It doesn't matter.
 "THE COURT: All right, take the jury across the hall. I'm not going to let you start talking about it to any jury when I sustained the objection. Take them across the hall.
(Jury out)
 "THE COURT: All right, let's have your offer of proof. *Page 146 
 "MR. STOKES: Judge, you want me to tell you what I am doing?
"MR. HART: No. We request that you tell him.
"MR. STOKES: The jury is not listening to it.
 "MR. HART: I know that. But I don't want you testifying and let him hear it. If he is going to make an offer of proof, Judge, I request that he make it.
 "MR. STOKES: I can make the offer of proof. But I thought I might explain to the Judge how we are —
 "THE COURT: All right, what is it you are trying to prove that happened on the 19th?
 "MR. STOKES: In the first place, all this happened from 9:30 in the morning of the 20th, the shooting that —
 "THE COURT: I know when it happened. But you are talking about the night of the 19th.
 "MR. STOKES: No, the night of the 19th, Judge, is just one step away from the 20th.
"THE COURT: Several hours, Mr. Stokes.
 "MR. STOKES: A few hours. Not any longer hours than from 9:00 o'clock to 5:00 o'clock that they let him testify what — From 9:00 o'clock in the morning until 5:00 o'clock that night. They took a statement at 5:30.
"THE COURT: What are you trying to show?
 "MR. STOKES: What I'm trying to show is his mental condition. His mental condition. That he had had trouble with his girlfriend or this lady he was living with and she was pregnant and she was about to abort the baby; that she was about to run off with another man and that he got to drinking and taking these speed pills and he went crazy and he let (sic) at 1:30.
 "THE COURT: And I sustain the object to getting into his wife about to run off with another man and all that kind of foolishness Mr. Stokes. That is far removed from what we are trying here today.
 "MR. STOKES: I know but we are trying to show his mental and emotional condition to see if he had a defect to the mind as to whether or not he —
 "THE COURT: I'll try to give you broad latitude to show a mental defect or disease.
"MR. STOKES: That's exactly what I —
 "THE COURT: I'm not going to let you get into something that's irrelevant.
 "MR. STOKES: A mental defect caused by many things, Judge. I understand. Are you saying I cannot pursue this particular question?
"THE COURT: That's what I'm saying.
 "MR. STOKES: We object and we reserve an exception." (R. 235-238).
There is authority that a trial judge may exclude evidence pertaining to mental competency if he deems it too remote.Eldridge v. State, 247 Ala. 153, 22 So.2d 713 (1945). However, we do not believe an occurrence which happened within 24 hours of the offense at issue should be excluded for this reason. It is "the safer and better practice" to exercise such discretion by admitting any fact which tends to prove such person's mental capacity. C. Gamble, McElroy's Alabama Evidence, § 61.01 (5) (3d ed. 1977).
Our discussion of this issue is not to be misunderstood as indicating that we believe the appellant was insane. All relevant evidence pertaining to the issue of the appellant's insanity should have been admitted into evidence under his plea. All competent and relevant evidence of the mental incompetency should have been presented to the jury so that they could properly decide this issue.
 VI
The indictment charging the appellant with the murder of Bernice Harvill contained two counts. Count I of the indictment alleged "intentional murder" and Count II alleged "reckless murder".
The appellant contends, citing Marsh v. State, 418 So.2d 191
(Ala.Cr.App. 1982), that the inclusion of § 13A-6-2 in Count I *Page 147 
of the indictment sufficiently put him on notice that he was charged with the violation of any part of that statute, either § 13A-6-2 (a)(1) (intentional murder) or § 13A-6-2 (a)(2) (reckless murder). The appellant filed a motion to require the State to elect between Counts I and II which was denied by the trial judge. He urges a reversal is required because this court stated in Toles v. State, 416 So.2d 768 (Ala.Cr.App. 1982), that multiplicity of counts in an indictment is to be discouraged.
However, a reversal is not mandated on this issue. In a recent Alabama Supreme Court case, Ex Parte Washington,448 So.2d 404 (Ala. 1984), this court's holding in Marsh, supra has been rejected. In that opinion, the Supreme Court stated that "intentional murder" is directed toward an individual and "reckless murder" is directed toward human life in general. Therefore, "reckless murder" is not a lesser included offense of "intentional murder".
If, as in this case, proof is to be shown as to "reckless murder" as well as "intentional murder," both must be alleged separately in the indictment. Therefore, the trial judge correctly denied the appellant's motion to require the State to elect.
 VII
Count Two of each of the twelve indictments for attempted murder reads as follows:
 "The Grand Jury of said County charge that before the finding of this indictment, Lewis Lamar Free, alias Lamar Free, whose name to the Grand Jury is otherwise unknown, did, with intent to commit the crime of Murder, (§ 13A-6-2 of Code of Alabama), attempt to commit the said offense by recklessly engaging in conduct which manifested extreme indifference to human life and created a grave risk of death to a person other than Lewis Lamar Free, alias Lamar Free, by shooting a rifle into a vehicle in which MacArthur Davis was riding as a passenger, in violation of § 13A-4-2 of the Code of Alabama."
Count Two of each of these indictments essentially charged that the appellant recklessly attempted to murder the personsnamed in the twelve indictments. Attempted murder is a specific intent crime. Chaney v. State, 417 So.2d 625 (Ala.Cr.App. 1982). An attempt to commit murder requires the perpetrator to act with the specific intent to commit murder. One must intentionally or knowingly attempt to commit murder. A general felonious intent is not sufficient. Accordingly, one cannot recklessly attempt to commit murder. Coleman v. State,373 So.2d 1254 (Ala.Cr.App. 1979).
If a person attempts to commit a murder and death ensues because of this act, that person is guilty of murder. However, merely because someone commits a murder does not mean that person is guilty of an attempt to commit murder. Coleman, supra. In other words, a person may recklessly commit murder but he cannot recklessly attempt to commit murder. Coleman, supra. Therefore, Count Two of each of these twelve indictments was defective for the above reasons. These counts should have been dismissed as a matter of law. The trial judge's refusal to do so was reversible error.
We must caution the prosecution that upon retrial of this case, the State must show proof of the appellant's specific intent to murder the person named in the indictment.
 "In Simpson v. State, 59 Ala. 1 (1877) discussing the crime of assault with intent to murder,[1] the Supreme Court stated:
 `. . . The offense charged must be proved, and an essential element of the present offense is not only an assault with intent to murder, but the specific intent to murder Ford, the person named in the indictment. If the intent *Page 148 
was to murder another, or if there was not the specific intent to murder Ford, there can not be a conviction of the aggravated offense charged, though there may be of the minor offense of assault or of assault and battery. . . .' (Citations omitted.)
 `Furthermore, at 12, the Court said: `. . . The true principal is, that the particular intent, the intent to murder the person assailed is [a] matter of fact, about which the law raises no presumptions, and indulges no inferences . . .' (Citations omitted.)
 `Simply put, the doctrine of transferred intent has no application to the offense of assault with intent to murder. Consequently, a general felonious intent, by implication of law, which will convert the killing of a human being into murder though his death was not the intent of the perpetrator has no application to the instant offense. The Supreme Court stated in Simpson, supra, at 18:
 `. . . It is excluded by the terms of the statute, which include only direct assaults on the person of the party it is averred there was the intent to murder. If in fact there was not the intent to murder him, whether there was a general felonious intent, or an intent to do harm to some other individual, is not important — there can be no conviction of the aggravated offense. . . .'" (Citations omitted.) (Footnote added).
Coleman, supra at 1257.
It is well settled that intent may be presumed from the use of a deadly weapon and the character of the assault. Chaney, supra. However, this evidence must be sufficient to allow the jury to conclude, by fair inference, that the appellant was shooting at the person (named in the indictment) in particular with the intent to murder him.
 VIII
The appellant further contends he was improperly convicted of thirteen offenses because his course of conduct did not consist of thirteen transactions. We must agree.
 "A single crime cannot be split up, or divided, into two or more offenses. Hurst v. State, 86 Ala. 604, 6 So. 120. Neither can a series of charges be based upon the same act. Gunter v. State, 111 Ala. 23, 20 So. 632; Clayborne v. State, 103 Ala. 53, 15 So. 842; Crosswhite v. State, 31 Ala. App. 181, 13 So.2d 693."
Baldwin v. State, 47 Ala. App. 136, 251 So.2d 633 (1971).
 "The State is without authority to split up one crime and prosecute it in parts. Savage v. State, 18 Ala. App. 299, 92 So. 19; Everage v. State, 14 Ala. App. 106, 71 So. 983; Moore v. State, 71 Ala. 307; Claude Crosswhite v. State, [31 Ala. App.] p. 181, 13 So.2d 693."
Lynn v. State, 31 Ala. App. 216, 14 So.2d 259 (1943).
 "Sometimes as a part of a single transaction more than one offense is charged to have been committed. If a person does a single act which results in the injury or death of more than one person, only one offense can be fastened upon him. But if in that occurrence he shoots different persons by different discharges of his firearm, an offense can be fastened separately as to each person so injured or killed, although there was but one transaction, and upon a trial for one such offense the whole transaction is admissible. Smith v. State, 88 Ala. 73, 76, 7 So. 52; Cheek v. State, 38 Ala. 227; Gunter v. State, 111 Ala. 23, 20 So. 632; Grissett v. State, 241 Ala. 343, 2 So.2d 399."
Kilpatrick v. State, 257 Ala. 316, 59 So.2d 61 (1952); Clementsv. State, 390 So.2d 1131 (Ala.Cr.App.), writ denied,390 So.2d 1136 (Ala. 1980).
The case at bar is a clear example of charging multiple offenses based on a single course of conduct. Only, in this case, we have more than one single transaction. In order to determine how many transactions occurred and thus, how many offenses are to be charged, we must review the facts. *Page 149 
Both occupants of the Sanks vehicle stated only one shot was fired at their vehicle. Therefore, only one transaction occurred, and the appellant could only be found guilty of one offense of attempted murder based on that transaction.
The same is true of the Shooks' vehicle. Only one shot was fired at their vehicle. Therefore, there was only one transaction and only one conviction for attempted murder could be sustained under that aspect of the evidence.
The occupants of the Williams' vehicle stated only one shot was fired at their vehicle and one of the occupants was struck and killed by that shot.
That shot constituted only one transaction and therefore, if the State sought to convict the appellant of murder, the five attempted murder convictions could not stand, Coleman, supra.
Only one shot was fired at the Moye vehicle. There was one occupant of this vehicle. Therefore, the one attempted murder conviction based on this transaction was proper. The same reasoning holds true as to the evidence shown for the Morris vehicle.
Several shots were fired at the Davis vehicle. However, there was only one occupant of this vehicle and therefore, the single attempted murder conviction was proper, under the evidence.
As our analysis above indicates, six separate transactions occurred on that morning and therefore the appellant only committed six separate offenses. The appellant may only be convicted of one offense per vehicle under the evidence in this record.
Therefore, the State improperly split six alleged crimes into thirteen offenses.
The State admits in its brief that there were only six transactions, but contends the appellant was not harmed by these thirteen convictions because he received only six sentences. However, § 13A-4-5 (c) Code of Alabama 1975 provides that:
 "A person may not be convicted of more than one of the offenses defined in sections 13A-4-1, 13A-4-2 and 13A-4-3 for a single course of conduct designed to commit or to cause the commission of the same crime."
Attempt is defined in § 3A-4-2, Code of Alabama 1975 and twelve of the thirteen convictions were for attempted murder. Seven of these convictions were based on three transactions. Therefore, according to the statute, the appellant cannot receive cumulative convictions based on the same transaction, under the attempt statute, regardless of the number of sentences which he received.
Thus, the trial judge should have required the State to elect between the offenses so that only one indictment per transaction (per vehicle) went to the trial jury.
For the reasons shown above, this cause must be reversed and remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur.
[1] There is little substantial difference between the offenses of attempted murder and assault with attempt to murder. 40 C.J.S. Homicide § 68 (1944).