[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1149 
Appellant, Lewis Lamar Free, was convicted of the intentional murder of Bernice Harvill, in violation of § 13A-6-2 (a)(1), Code of Alabama 1975. Appellant was also convicted of the attempted murder of McArthur Davis, Nellie Shook, Sherman Sanks, Robert Earl Moye, and Sherry Gibbs Morris, in violation of § 13A-4-2. The trial court sentenced appellant to a term of life imprisonment in the penitentiary on the murder conviction and a term of twenty years in the penitentiary on each conviction for attempted murder. The attempted murder sentences were to run concurrently with each other and consecutively to the life sentence for murder. Appellant appeals these convictions.
This was appellant's second trial, his first conviction being reversed by this court in Free v. State, 455 So.2d 137
(Ala.Cr.App. 1984). In Free, 455 So.2d at 147, this court stated, "We must caution the prosecution that upon retrial of this case, the State must show proof of the appellant's specific intent to murder the person named in the indictment." We deem it helpful to recite the facts elicited at the second trial.
On the morning of November 20, 1981, J.D. White, the warden at Holman Prison, observed appellant park his pickup truck on the side of the road near Wet Weather Creek Bridge (hereinafter referred to as "the bridge"). The bridge is located on Highway 21, north of Atmore and just south of Holman Prison and G.K. Fountain Correctional Center. White stated that appellant was seated behind the steering wheel of the vehicle and was the only occupant. White testified that, when he saw appellant, he thought appellant was a deer hunter, and because the land in that area belonged to the prison, White pulled off the road. Appellant's vehicle "moved on." White then continued on to his destination. Approximately six to ten minutes later, while he was listening to his car communications radio, White heard that there was shooting at the bridge. *Page 1150 
Sherman and Mergle Sanks were traveling south on Highway 21, when they observed a pickup truck parked by the side of the road near the bridge. Mr. Sanks, who was driving, observed that the driver's door of the truck was open, and that appellant was standing beside the door with a rifle in his hands. Mrs. Sanks stated, "[T]he man is going to shoot." Mr. Sanks watched as appellant "raised the gun, but he didn't fire right away." When the Sanks vehicle was approximately sixty yards from appellant, he fired the rifle. A bullet struck the Sanks vehicle "right above the grill" on the driver's side. The Sanks vehicle stalled, and Sanks placed it in neutral and let it roll across the bridge past appellant. Mr. and Mrs. Sanks escaped in another person's vehicle.
John and Nellie Shook were traveling north on Highway 21, when they observed appellant's vehicle parked on the side of the road. Mr. Shook stated that he noticed nothing unusual until there "was an explosion in my car." Mr. Shook initially began to stop his vehicle, but his wife said, "Somebody is shooting at us." A bullet had entered the back window of the Shook vehicle, hit the top of Mrs. Shook's ear, and exited the front window of the vehicle. Mr. Shook saw blood coming from his wife's ear. They proceeded to the top of the hill, where they encountered a uniformed prison guard and "some prisoners."
Glenn A. Williams was traveling north on Highway 21 with five members of his family. The passengers in Williams's vehicle were his wife, Ann Williams (seated on the passenger side of the front seat); his niece, Teresa Blair (seated in the left rear seat); his mother, Myrtle Williams (seated in the center rear seat); his sister, Bernice Harvill (seated in the right rear seat); and his great-niece, Candida Harvill (seated in Bernice Harvill's lap.) Williams saw appellant sitting in his vehicle "facing out looking right at me." Appellant then got out of his vehicle, and Williams "saw a gun come down out of the air" and the gun was aimed down the road "ahead of where I was going." Initially, appellant did not aim directly at the car. Mrs. Williams watched appellant as they drove past him, and as they passed, Mrs. Williams stated, "He is going to shoot." Mr. Williams then instructed the occupants of his vehicle to "duck." A shot was then fired through the right rear window of the vehicle. This bullet struck and killed Bernice Harvill.
Robert Earl Moye was traveling south on Highway 21 in his employer's "L.P. gas truck." Moye stated that he observed cars stopped at the top of the hill near the correctional center and that someone tried to stop him, but he ignored him. Moye saw appellant exit his vehicle with a "gun." Moye stated that appellant aimed "his gun across the highway," and he thought that appellant was preparing to shoot a deer, because it was deer season. Moye slowed his vehicle and then suddenly appellant turned and pointed the gun at Moye. Moye was alone in his vehicle and it appeared to him that appellant was aiming the rifle directly at him. Appellant then "started doing something with his gun." Moye lay down in the seat, and his truck struck the bridge. After crossing the bridge, Moye heard the gun fire, although he did not actually see the rifle when it was fired. No bullet holes were found in Moye's vehicle. Moye got to the top of the hill and started stopping traffic.
Sherry Gibbs Morris was traveling alone in her vehicle, south on Highway 21 when she observed appellant standing beside his vehicle "holding a gun." Morris stated that the weapon was pointed toward her vehicle and that she got down in the floorboard as she approached appellant's position. Morris heard a shot, but it did not strike her vehicle. On cross-examination, when pressed by defense counsel about where the weapon was aimed, Morris stated that the "gun was pointed at me."
Investigator McArthur Davis, of the Alabama Department of Corrections, was in his office at Fountain Correctional Center when he received a radio request from a prison farm office for assistance and an ambulance. Davis drove to the scene and observed cars stopped near the correctional *Page 1151 
center entrance. Davis collected his weapons and proceeded toward the two vehicles near the bridge. Davis did not know from which vehicle the shots were fired, and he first proceeded to the Sankses' abandoned vehicle. Davis stopped near the Sanks vehicle; then he heard a gunshot, and a bullet hit his vehicle. Davis lay down in the seat of his vehicle, and he then heard a second shot. Davis then looked over the dashboard of his vehicle and saw a gun barrel protruding from appellant's truck and steam coming from under the hood of Davis's own vehicle. According to Davis, "I was just in the right place to be shot," so he placed his vehicle in reverse and backed across the road, stopping at a point directly behind appellant's truck. A third shot was fired. Appellant's truck had a screen over the rear window and Davis could not see inside the truck. Davis got out of his vehicle and took a position at the rear of the vehicle. A fourth shot was fired, and Davis fired back. During the next ten minutes, five or six more shots were fired by appellant, and Davis returned fire on each occasion. Appellant then waved his hand from his position in the truck. Davis used the public address system in his vehicle to order appellant out of his truck, and he instructed him to lie down in the road. Appellant waved his hand again, but he did not comply with Davis's instructions. Appellant then fired his rifle several more times, and Davis returned fire on each occasion. The total exchange between appellant and Davis lasted approximately fifteen minutes.
When the Atmore police arrived, Davis had not sighted appellant for approximately two minutes. The Atmore police approached appellant's truck and opened the doors. Davis approached and saw appellant lying facedown on the floorboard of his truck with the rifle lying under him. Police authorities recovered a .30/.30 lever action rifle, an empty ammunition box, nineteen spent hulls, and one bent live round of ammunition.
Officer Jimmy E. Helton, of the Atmore Police Department, was present when appellant was removed from his truck. He testified that appellant, while in his truck, stated, "I have no other guns." Appellant was searched, and no weapons or drugs were found on his person. Fourteen empty beer cans were found in appellant's truck, along with eighteen unopened cans of beer. Appellant had sustained a "very minor" buttocks wound and was transported to Greenlawn Hospital at approximately 10:30 a.m. Appellant was twice informed of his Miranda rights, and, according to Helton, he appeared to be "completely" in control of his faculties. While at the hospital, appellant stated, "I don't know them" and "I was mad," referring to the shootings at the bridge.
Investigator Ronnie Cribbs, of the Alabama Bureau of Investigation, in the presence of Investigator James Dixon, interviewed appellant at the Atmore City Jail. Cribbs and Dixon arrived at appellant's cell at approximately 5:00 p.m., where appellant was sleeping. Appellant was taken to an interview room. He was informed of the charges pending against him and given his Miranda rights. Appellant then made a statement to the officers. Cribbs and Dixon stated that they did not detect the odor of alcohol on appellant, nor did appellant appear to be under the influence of drugs. Appellant's statement was written down by Dixon, and after it was read to, and by, appellant, he signed the statement. Appellant's statement was as follows:
 "I left Greenville Thursday night around 8:00 p.m. I went to Pascagoula, Mississippi, to see my son who is 6 years old. I haven't seen him since last Christmas, but I couldn't find the street where he lived.
 "I have been divorced since 1978. I haven't remarried. I have a girlfriend in Greenville, a Shirley Butts. I bought a case of beer in Mississippi. I was going back to Greenville, Alabama. I had been up all Thursday night. I got lost. I do remember shooting into the cars.
 "But I don't know why. I shot more than one time. I shot all my shells. I don't know why I did it. Things haven't went right for me. I was real mad cause *Page 1152 
I couldn't see my son. I hate I killed someone.
 "I am a welder by trade. I work for McMillan-Bodel [sic] in Pine Hill, Alabama."
After a hearing on appellant's motion to suppress, the court determined that the statement was admissible.
An autopsy performed on Bernice Harvill indicated that the cause of death was a gunshot wound to the head. The rifle found in appellant's truck was determined to have fired the bullet which killed Bernice Harvill and to have fired the spent ammunition found in and around appellant's truck.
Appellant asserted an insanity defense at trial. Three employees of Greenlawn Hospital were called by the defense. These witnesses established that appellant was transported to Greenlawn Hospital on two different occasions on the day of the shootings. When appellant was first brought to the hospital, he was described as "angry and aggravated" and "uncooperative." Blood and urine samples were taken from appellant. The blood sample was placed in the wrong type tube, so appellant was returned to the hospital at approximately 2:00 p.m. that afternoon in order to obtain a second sample. The three hospital employees, on cross-examination, testified that on the occasions when they observed appellant he appeared to be in control of his faculties.
Matthew Tolbert Barnhill, Jr., a state forensic toxicologist at the Mobile Regional Laboratory, testified that he performed an alcohol and drug screen on appellant's second blood sample. The blood test indicated that appellant tested positive for "ethyl alcohol 0.15 percent." Barnhill also testified to the normal absorption rate of alcohol through the human body and estimated the possible percentage of alcohol in appellant's blood at the time of the shooting. A test for particular drugs indicated that none tested for were present in appellant's system. Barnhill stated that he did not specifically test for the presence of amphetamines, which, during the trial, appellant claimed to have taken prior to the shooting. A copy of the urine test conducted by Regional Medical Laboratories, Inc., of Pensacola, Florida, was shown to Barnhill. It indicated that the urine speciman was "consistent with sympatheticamine." According to Barnhill, sympatheticamine is a class of drugs of which amphetamines are a member. On cross-examination, Barnhill stated that the urine test was not conclusive as to the presence of amphetamines.
David Gafford, a barber and preacher from Greenville, testified that he had known appellant for most of appellant's life. Gafford testified that various members of appellant's family were mentally retarded, and that appellant's father was an alcoholic.
Deputy Sheriff James R. Collins testified that he was a jailer at the Escambia County Jail, where appellant was being housed. Collins testified to an incident in which appellant banged his head against the cell, threw his food, and acted "unbalanced." Collins also verified that appellant was taking 25 milligrams of Mellaril regularly. On cross-examination, Collins stated that he did not see anything more abnormal about appellant than he did any other inmate, and that, in fact, appellant was much quieter than most.
Chief Jailer Charles M. Adkins testified to the same incidents as Collins, and characterized this behavior as "normal" for inmates; he stated that such conduct "happens quite frequently," especially with new inmates. An inmate reported to Adkins that he believed appellant had an "epileptic fit" on February 17, 1983. Appellant once told Adkins he was having nightmares and thought his girlfriend was after him with a knife. On cross-examination, Adkins stated that appellant would become more belligerent and agitated near court appearance dates. Appellant acted in a sane manner during the time he was observed by Adkins.
Clay Kelly, a pastoral counselor, stated that he had interviewed appellant while appellant was in jail, and that appellant had *Page 1153 
difficulty "understanding or responding" to questions, and, therefore, that he had recommended that appellant be seen at Taylor Hardin Secure Medical Facility, a state mental facility. In Kelly's opinion, appellant was not faking.
Daryl Sales, who was serving time on weekends for a D.U.I. conviction, shared a cell with appellant. Sales related incidents wherein appellant acted "abnormal." According to Sales, appellant sometimes would not respond and would act as if he were not there.
Douglas Edgar testified that he had known appellant since appellant was nine or ten years old, and that he was familiar with appellant's family. According to Edgar, appellant's father drank too much, but appellant "always acted normal."
Raymond Crissell, Jr., testified that he had once worked with appellant for about three months, and that appellant talked about his wife and child much "more than normal." Crissell had seen appellant shortly before the shooting, and he testified that on that occasion appellant had cried when he talked about the divorce from his wife and the separation from his child.
Shirley Scofield[1] testified that she lived with appellant, after his divorce, for approximately one year, but that she and appellant "broke up" about five weeks before the shooting. Scofield was pregnant with appellant's child, but refused to marry him. According to Scofield, she and appellant separated because of appellant's drinking problem and his drug use.
Appellant called eight family members to testify in his behalf. These witnesses testified to the deplorable conditions of appellant's childhood. They testified that his father was an alcoholic, who beat his children, including appellant, and threatened to kill them with a pistol. According to these witnesses, appellant never struck back at his father or attempted to "take up for himself."
These witnesses also related an incident in which appellant attempted suicide by cutting his wrist. According to hospital records, introduced by the defense to substantiate this claim, appellant suffered "superficial lacerations, allegedly cut with knife by someone." These witnesses believed that appellant attempted suicide due to depression resulting from the death of his grandfather in 1978, and the divorce from his wife in 1979.
Appellant was also reported by the same witnesses to "phase out" and act like he was in "another world" on many occasions. There were also incidents related in which appellant did "unusual" things, such as urinate on lawn mowers and attack his brother-in-law for no reason. Most of these witnesses agreed, on cross-examination, that appellant was not "insane."
Appellant testified in his own behalf at trial. He stated that on November 19, 1981, he awoke at 4:00 a.m. to prepare for work. He worked a ten-hour day and departed at 5:00 p.m. after receiving his paycheck. He had "car pooled" to and from work with Steve Curtis. Returning from work, he said, he and Curtis purchased a case of beer and Curtis sold him fifteen "speckled bird" amphetamine pills.
Appellant stated that he arrived in Greenville at approximately 6:30 p.m. and went to his mother's house. This visit was verified by his mother and sister. He stayed at his mother's home for fifteen to thirty minutes before departing for the home of his girlfriend, Shirley McCullough. He stated that he and McCullough had "broke up" and he was attempting to revive the relationship, but that she did not want to marry him. He testified that he felt very depressed because "nobody loved me." McCullough was visiting relatives but he located her and "drank a couple of beers" while with her. He began feeling the effects of the amphetamines. He and McCullough had an argument and he returned to his mother's home. Appellant's mother and sister testified that appellant *Page 1154 
returned to their home at approximately 1:00 to 1:30 a.m. and remained there about an hour. Appellant testified that his memory was "fuzzy," but that he thought he talked with his sister, although he stated that he could not remember the nature of the conversation.
Appellant testified that he departed from his mother's home and proceeded down Interstate Highway 65. According to him, about this time, he took five amphetamine pills. He testified that at that time he had no idea where he intended to go and stated, "I remember coming to myself at Van Cleve exit past Pascagoula, Mississippi." Appellant then stated that he was going to see his son, who was living with appellant's former wife. Appellant was unable to locate his former wife's trailer and decided to return to Greenville. Prior to departing Pascagoula, he purchased "another case of beer." He remembered getting on "old Highway 90," and stated:
 "[T]hen next thing I remember I got to driving down the road. I don't know where all these bad — All these bad things happened in my life started running through my mind; how people done me wrong all my life and mostly upset and I remember cussing the good Lord for all the bad things that happened to me. That is the last thing I remember until I came to myself in the hospital."
Appellant stated that he did not know how he got to Atmore and had no recollection of the shootings at the bridge.
According to appellant, he next remembered being in the hospital and being requested to urinate in a plastic cup. According to appellant, the hospital personnel inserted a plastic tube in his penis to obtain the sample. Hospital personnel denied that this occurred. Appellant stated that he remembered being booked at the jail and that then he passed out. Appellant did not recall making the statement to Cribbs and Dixon and testified that parts of the statement were incorrect. When questioned on cross-examination, he acknowledged that most of the statement was accurate. When asked how the officers obtained the statement, appellant responded, "Apparently it had to come from me. I don't remember them taking no statement."
Dr. Claude L. Brown, a psychiatrist from Mobile, testified that he examined appellant for one hour on November 16, 1984, and was of the opinion that appellant suffered from "a mixed personality disorder." Brown stated that, in his opinion, appellant "did not fully comprehend either the nature or the quality of the meaning of his act" of shooting into cars at the bridge.
On cross-examination, Brown acknowledged that his results were "absolutely opposite" to those reached by the evaluation team at the Taylor Hardin mental health facility. Brown conducted no testing on appellant, did not talk with anyone other than appellant, and did not verify anything appellant related, other than with appellant's attorney. According to Brown, appellant was a competent individual up to twelve hours before the incident and was probably competent again twelve to twenty-four hours after the incident.
The State, in rebuttal to this testimony, called Dr. Alexander Salillas from Taylor Hardin Facility, who conducted the court-ordered psychiatric evaluation of appellant to determine appellant's competency to stand trial and his responsibility at the time of the "alleged crime." Salillas observed appellant on a regular basis from June 18, 1982, through August 5, 1982. Based on Salillas's examination and interviews with appellant, he was of the opinion that appellant could not have been considered insane at the time he fired the shots at the bridge.
 I
During voir dire examination of the jury panel, the trial judge questioned the panel concerning their ability to give appellant and the State "a fair and impartial trial." The following colloquy occurred between prospective juror Michael Jalis and the court:
 "JUROR: Michael Jalis. I have heard the news media, the paper, radio, and —
"THE COURT: All right, did the information — *Page 1155 
"JUROR: Sir?
 "THE COURT: Did the information that you have received from the news media give you a fixed opinion as to the guilt or innocence of the Defendant?
 "JUROR: I was also talking to the judge yesterday morning. It was a discussion, general discussion, breakfast morning.
 "THE COURT: What I am asking, do you have a fixed opinion as to the guilt or innocence of the Defendant?
"JUROR: I think I do.
 "THE COURT: You don't think you could give him a fair and impartial trial?
"JUROR: I wouldn't think so.
"THE COURT: I will excuse you for cause."
Appellant moved for a mistrial based on the juror's comments relative to speaking with "the judge." The trial judge made it clear that the juror had not, at anytime, spoken with him about appellant's case or any other case. The motion was denied.
Appellant argues on appeal that the juror's reference to "the judge," coupled with the juror's statement that he could not sit impartially on the jury, prejudicially tainted the entire jury panel because a judge's expression has "tremendous power and influence over the thinking of the jury members and for that reason any expression which may infer partiality is error which would deny the accused a fair and impartial trial." He cites Dolvin v. State, 51 Ala. App. 540, 287 So.2d 250 (1973), and Johnston v. City of Birmingham, 338 So.2d 7 (Ala.Cr.App. 1976), to support his argument. Both Dolvin and Johnston
present situations clearly distinguishable from the case before us. In those cases, the juror's contact was with the judge presiding over the trial, while in the instant case, although we do not know to whom Jalis was referring, he was certainly not referring to the trial judge. The trial judge in the instant case, at no time, said anything that indicates that he had an opinion about the case.
In Cole v. State, 352 So.2d 17, 19 (Ala.Cr.App.), cert. denied, 352 So.2d 20 (Ala. 1977), this court held that "[a] challenge to the array or a motion to quash or strike the venire will not be sustained unless it is alleged and proved that the whole venire is tainted with prejudice." Appellant failed to establish that the entire venire was tainted with prejudice due to the statements made by Jalis. There was no showing as to who "the judge" was or what subjects they discussed. The testimony of Jalis does not indicate whether the remarks were made about the instant case or whether they affected him. There is absolutely nothing in the record to support a claim that the entire venire was prejudiced, and we will not speculate as to these matters based on the evidence before us. It would be most unreasonable to assume that the jury in this case could have been affected by the remarks of the juror to such an extent that they would have disregarded their responsibility and the court's charge. The trial court acted properly in overruling appellant's motion for a mistrial.
 II
Appellant next contends that the statement obtained from him by Cribbs and Dixon was not voluntarily made because his mind was "substantially impaired" at the time the statement was obtained. Appellant argues that his lack of food and sleep, in combination with his consumption of drugs and alcohol preceeding the shooting, rendered the confession or admission involuntary and inadmissible. We disagree.
Appellant's testimony concerning his drug and alcohol consumption prior to the shooting has been fully detailed and will not be restated. We note that the principle evidence upon which appellant relies to prove that he was so intoxicated that he did not know what he was doing at the time of the taking of the statement comes from appellant himself. Expert testimony, presented by appellant, as to the presence of drugs and alcohol in appellant's system at the time the statement was obtained, is speculative. The State offered the testimony of Cribbs and Dixon, who testified that *Page 1156 
appellant did not appear to be intoxicated and seemed to be in complete control of his faculties when the statement was taken more than seven hours after the shooting. Neither Cribbs nor Dixon smelled alcohol about appellant's person. Sandra Hendrix, a laboratory medical technologist at Greenlawn Hospital, observed appellant when he was escorted to the hospital at 10:00 a.m. and 2:00 p.m. Hendrix testified that he appeared to be in control of his faculties. The evidence presented on the issue of appellant's intoxication at the time of the taking of the statement was conflicting.
A similar factual situation was presented in the recent case of Moore v. State, 488 So.2d 27 (Ala.Cr.App. 1986), wherein we stated:
 "It is well settled that in order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made. Moore v. State, 415 So.2d 1210, 1214 (Ala.Cr.App. 1982), cert. denied, No. 81-728 (Ala.), cert. denied, 459 U.S. 1041 [103 S.Ct. 459, 74 L.Ed.2d 610] (1982), and cases cited therein. `Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.' Tice v. State, 386 So.2d 1187 (Ala. 1980), and cases cited therein. See also Palmer v. State, 401 So.2d 266, 268 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala. 1981), cert. denied, 455 U.S. 922 [102 S.Ct. 1280, 71 L.Ed.2d 463] (1982).
 "The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Tice; Garrison v. State, 372 So.2d 55 (Ala.Cr.App. 1979).
 "`The degree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed to the trial court, and depending upon its ruling, then to the jury for its consideration.' Tice, 386 So.2d at 1185."
In the instant case, as in Moore, supra, there was conflicting evidence on the issue of intoxication. We also find that the evidence is conflicting on appellant's claim that his confession was involuntary for lack of sleep or food. Appellant claims that he had not slept since 4 a.m., November 19, the day before the shooting; however, the evidence shows that he was asleep in his cell when the officers went to talk with him at 5:00 p.m. on November 20. He further claims that he had not eaten since noon on November 19 and that he had a gunshot wound to his buttocks. (This wound was considered to be superficial). In light of the testimony of the State's witnesses that appellant was in complete control of his faculties, we adhere to the following principles:
 "Where the voluntariness inquiry presents conflicting evidence, great weight must be given the trial judge's finding of voluntariness. Even when there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, Ex parte Thompson, 347 So.2d 1377 (Ala. 1977), cert. denied, 434 U.S. 1018 [98 S.Ct. 740, 54 L.Ed.2d 765] (1978). `The trial court does not have to accept the testimony of (the) defendant as to the voluntariness of a confession if there is substantial testimony by others sufficient to constitute a predicate for the admission in evidence of the confession.' Bradley v. State, 337 So.2d 47, 50 (Ala.Cr.App. 1976)."
Moore v. State, 415 So.2d 1210, 1214-15 (Ala.Cr.App.), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982).
There was sufficient credible evidence from which the trial court could conclude that appellant's confession was voluntary, *Page 1157 
and since this decision was not contrary to the great weight of the evidence, we find that it should not be disturbed on appeal. We find no error in admitting appellant's confession.
 III
Appellant made a pre-trial motion to instruct the prosecution not to make mention of appellant's prior trial. The court granted this motion and instructed the parties to refrain from making references to appellant's prior trial or to the fact that he had been previously convicted. Appellant contends that the State violated this order and that his motion for a mistrial should have been granted.
During cross-examination, defense counsel sought to impeach State's witness Jimmy Helton and posed to him the following question:
 "Q. You recall giving some testimony in this case back on June 16, 1983?
"A. Yes, sir."
On re-direct examination, the prosecution questioned Helton as follows:
 "Q. Mr. Byrd asked you about some testimony in a previous trial. Were you asked the same questions you were asked today.
"A. No, sir."
Defense counsel then objected to the State's reference to appellant's previous trial, and moved for a mistrial. We note that the reference was made to "a previous trial" and not "appellant's previous trial." Appellant's motion for a mistrial was denied. Counsel, outside the presence of the jury, moved that the jury be instructed to disregard any mention of a previous trial, and the motion was granted. However, when the jury returned, the court asked the jury if they remembered the last question asked by the State, to which no juror responded. The court then refused to follow up with an instruction as requested. Appellant contends that because the trial court failed to instruct the jury to disregard the question and answer, the prejudice resulting from the statement was not eradicated and therefore constituted reversible error.
We find appellant's argument to be without merit. Under the circumstances, we do not believe that the question and answer concerning the previous trial were of such significance as to be prejudicial to appellant. It could be argued that defense counsel opened the door to the subject by the question he asked about Helton's previous testimony. Moreover, apparently, the question concerning "a previous trial" made no impression on the jury, for a few minutes after the question was asked, no juror could remember it.
The granting of a mistrial is an extreme measure and should be exercised only when manifestly necessary or when the ends of justice would otherwise be defeated. Nix v. State,370 So.2d 1115 (Ala.Cr.App.), cert. denied, 370 So.2d 1119 (Ala. 1979); §12-16-233, Code of Alabama 1975. The granting of a mistrial is addressed to the broad discretion of the trial judge, and his ruling will not be revised on appeal unless it clearly appears that such discretion has been abused. Chillous v. State,405 So.2d 58 (Ala.Cr.App. 1981). In the case before us, the trial judge was in the better position to weigh the matter and determine whether the question had so prejudiced the jury that the ends of justice required the granting of a mistrial. We find no abuse of the trial judge's discretion here. In the light of the record here presented, we are of the opinion that the mistrial motion was properly denied. See Phillips v. State,447 So.2d 1312 (Ala.Cr.App. 1984).
 IV
Appellant challenges the sufficiency of the evidence relating to the convictions of attempted murder of Robert Earl Moye and Sherry Gibbs Morris. Their testimony has been fully detailed and will not be repeated. The basis of appellant's argument is grounded on the facts that, in each incident, neither Moye nor Morris was watching when the shot was fired and no bullet hole was found in either vehicle. Both *Page 1158 
Moye and Morris testified that each saw appellant point the gun at them and heard a shot fired just as appellant passed out of their view.
In Chaney v. State, 417 So.2d 625, 626-27 (Ala.Cr.App. 1982), this court stated:
 "In Alabama, a person commits the crime of attempt to murder if he intends to cause the death of another person and does any overt act towards the commission of that intent. . . .
". . . .
 "Intent may be presumed from the act of using a deadly weapon . . . and from the character of the assault, including the nature and amount of force used in inflicting the fatal injury. . . ." (Citations omitted.)
We believe the evidence was more than sufficient to sustain the convictions for attempted murder of Moye and Morris. There is no question that appellant was armed with a deadly weapon. This weapon was pointed at the potential victims as each approached appellant, and ultimately a shot was fired at in each instance. In both instances, Moye and Morris were the lone occupants of the vehicle each operated, and no other vehicles were in the area when the shots were fired. Based on this evidence and the evidence presented of the other incidents, the jury could reasonably and properly have concluded that appellant attempted to murder Moye and Morris.
 V
Appellant next argues that the State failed to prove appellant had a "specific intent" to murder the persons named in the indictments charging attempted murder. Appellant seizes on our language in his previous appeal to conclude that specific intent was not proven. In Free, 455 So.2d at 148, we stated:
 "It is well settled that intent may be presumed from the use of a deadly weapon and the character of the assault. Chaney [v. State, 417 So.2d 625
(Ala.Cr.App. 1982)]. However, this evidence must be sufficient to allow the jury to conclude, by fair inference, that the appellant was shooting at the person (named in the indictment) in particular with the intent to murder him."
This language must be read in the context of the appeal from appellant's original trial where the State obtained twelve convictions for attempted murder based on six shooting incidents. Originally, appellant was charged with the attempted murder of all occupants of a vehicle where only one shot was fired. In the instant case, the State proceeded on the theory that appellant was shooting at only one occupant of a vehicle.
In the Sherman Sanks case, the bullet fired from appellant's rifle struck the Sanks vehicle above the grill on the driver's side. Sanks followed the path of the bullet into the engine compartment of the vehicle and concluded that, had the bullet not struck the vehicle at the point it did, it would probably have hit him. The Sankses also saw appellant pointing the rifle at their vehicle. This evidence, taken as a whole, would have permitted the jury to reach a "reasonable factual conclusion that appellant was shooting at" Sherman Sanks with the intent to murder him. Coleman v. State, 373 So.2d 1254, 1257
(Ala.Cr.App. 1979).
In the Nellie Shook case, the bullet fired from appellant's rifle entered through the rear windshield of the Shook vehicle, struck Nellie Shook's ear, and then exited through the front windshield. This evidence, taken as a whole, would have permitted the jury to reach a reasonable factual conclusion that appellant was shooting at Nellie Shook with the intent to murder her.
Robert Earl Moye, Sherry Gibbs Morris, and McArthur Davis were alone in their respective vehicles when appellant fired at them. Although neither Moye nor Morris was watching when appellant fired, and bullet entry holes were not found in their vehicles, each saw appellant aiming his weapon at him and each heard a shot fired shortly thereafter. McArthur Davis had several shots fired at him and at least two shots struck his vehicle on the driver's side, where Davis was originally located. This *Page 1159 
evidence, taken as a whole, would have permitted the jury to reach a reasonable factual conclusion that appellant shot at Robert Earl Moye, Sherry Morris, and McArthur Davis with the intent to murder each of them.
We find appellant's contention that he only had a general intent to shoot at cars as they passed to be without merit. The location of the bullet entry points, in most of these incidents, and the fact that one person was killed and another wounded, negates such a contention. We find that the evidence was sufficient to sustain appellant's convictions.
 VI
Appellant's contention that Dr. Salillas's testimony was based on inadmissible hearsay evidence of members of the Taylor Hardin evaluation team is without merit. The objectionable question posed to Dr. Salillas was rephrased to conform to the observations and evaluations made specifically by Dr. Salillas, to which he properly responded. There was no error in the admission of this testimony.
 VII
Appellant next contends that the trial court erred in refusing to give various requested written instructions on lesser included offenses in regard to the murder and attempted murder charges.
In regard to the murder charge, since appellant introduced evidence of voluntary intoxication at the time of the shooting, he argues that he was entitled to an instruction on manslaughter as a lesser included offense of murder, citingCrosslin v. State, 446 So.2d 675 (Ala.Cr.App. 1983). Appellant argues that his requested instructions 44 and 64 are "correct statements of the law with regard to lesser included offenses." These two charges are the only charges appellant specifically argues in his brief.
Requested jury charge 44 tracks the language of § 13A-6-3
(a)(1) and (2), Code of Alabama 1975; that requested charge is a correct recital of the law defining manslaughter. This charge was properly refused, because it contains concepts of law which are "not applicable to the evidence presented at trial even though said charge is arguably a correct statement of law."Rogers v. State, 417 So.2d 241, 247 (Ala.Cr.App. 1982). See also Scanland v. State, 473 So.2d 1182 (Ala.Cr.App. 1985). Appellant was charged with intentional murder, and there was absolutely no evidence that appellant killed Mrs. Harvill during a "sudden heat of passion" caused by provocation of law.Rogers, 417 So.2d at 248. Additionally, this charge was merely an abstract statement of law and was not hypothecated on the evidence. Bell v. State, 475 So.2d 609 (Ala. 1985), cert. denied, ___ U.S. ___ , 106 S.Ct. 607, 88 L.Ed.2d 585 (1985).
Requested jury charge 64 states: "Although voluntary intoxication caused by alcohol or drugs is not a defense to a criminal charge, it may render the accused incapable of forming the intent necessary to constitute the offense of murder and reduce the offense to manslaughter." This charge is merely an abstract statement of law and is not hypothecated on the evidence. Bell. "Requested instructions which are mere statements of legal principles, without instructions as to the effect upon or application to the issues, are abstract and may properly be refused. This is true even where a correct principle of law is set out." Wyrick v. State, 409 So.2d 969
(Ala.Cr.App. 1981). Additionally, we believe that appellant's objection does not properly preserve for review the court's refusal to give this charge. Rule 14, A.R. Crim.P.Temp., states in pertinent part:
 "No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection." (Emphasis added.) *Page 1160 
When defense counsel objected to the court's refusal to give requested jury charge 64, counsel stated, "and 64 and 63 deals with attempt as a correct statement of the law regarding attempt." This objection is inadequate and fails to state a proper objectional ground for the court's refusal to give the charge, for the charge clearly has nothing to do with the law of "attempt." The requested charge, as written, was properly refused by the trial court.
In regard to the charge of attempted murder, appellant makes a general argument concerning the trial court's refusal to give his requested instructions on the lesser included offenses of attempted murder. Appellant submitted sixty-four written requested jury charges. The following requested charges were marked "given but not read" — they were covered in the court's oral charge: 1 through 11, 13 through 15, 18, 19, 23, 30 through 33, 40, 41, 47, and 59. The following requested charges were marked as "given" and were read to the jury: 17, 28, 29, 35, and 38. The trial court properly denied the following requested instructions for the reasons stated: 12 and 63, because they were covered in the court's oral charge; 20 through 22, 24 through 27, 34, 39, 42, 38, 50 through 58, and 60 through 62, because they are abstract statements of the law and not hypothecated on the evidence. Additionally, requested charges 16, 21, 22, and 25 are incorrect statements of the law. Charges 36 and 37 are affirmative charges directing a verdict for appellant, and they were properly refused. Requested charges 43, 45, and 46 are incomplete in that they fail to set out the elements of the lesser crimes contained therein, and are therefore confusing; they were properly denied. Requested charges 48 and 49 are incomplete, confusing, and abstract.
We find no error in the trial court's refusal to give the written requested charges.
 VIII
The trial court instructed the jury on the reasonable doubt standard as follows:
 "So the law says the State is only required to prove guilt beyond a reasonable doubt and a reasonable doubt is a doubt really that should have some substance to it. When I say `substance,' I don't mean by the amount but that it's got to be based — it may be based either on all of the evidence; it may be based on a part of the evidence; it may be based on a failure of the evidence, but whatever it is you should be able to say to your fellow jurors, `I am not convinced of the guilt of this Defendant because . . .' and point out to them what it is. As I say, it might be something that was not in evidence and that you feel should have been in evidence. It might be something that just arose out of a part of the evidence and it might be a doubt that came from all the evidence. But whatever it is you should be able to point it out to your fellow jurors and give voice to it."
Appellant contends that this charge "unduly emphasized the ability of a juror to express his doubt and, in fact, intimated to the jury that should they be unable to express adequately their doubt, then they should convict." We disagree with appellant's assessment of this portion of the court's charge.
We view the court's charge as a lengthy way of defining reasonable doubt as "a doubt for which a reason may be given," as approved in Williams v. State, 455 So.2d 210 (Ala.Cr.App. 1984), and Hall v. State, 54 Ala. App. 198, 306 So.2d 290
(1974), cert. denied, 293 Ala. 757, 306 So.2d 294 (1975). InHall, 54 Ala. App. at 202, 306 So.2d at 293, the court held that reasonable doubt is properly defined as "a real doubt or a substantial doubt growing out of the evidence. It is a doubt for which a reason can be given." There was nothing in the quoted charge which intimated to the jury that they should convict if they were "unable to express adequately their doubt," as argued by appellant. We find no error in the court's definition of reasonable doubt. *Page 1161 
 IX
During the court's oral charge, a juror requested additional information concerning how alcohol "pertains to the law of what can be a defense for insanity — ." The court responded:
 "Well, let me say this. A person can't come in here and say now to the Court, `I'm not responsible for my acts because of alcohol. I have been drinking too much.' I don't think a person can ever claim insanity just based on drinking, on alcohol. I don't think that is the law."
The Court continued and charged the jury, a second time, that if they found that alcohol rendered appellant "incapable of forming an intent to commit that act, then you can't find him guilty of it." Appellant argues that the court's charge is a misstatement of the law and constitutes reversible error. We do not agree.
Appellant relies on Lister v. State, 437 So.2d 622, 624
(Ala.Cr.App. 1983), which holds:
 "Although excessive intoxication may produce insanity, Beasley v. State, 50 Ala. 149 (1876); Harmon v. State, 23 Ala. App. 468, 126 So. 896 (1930), `legal insanity does not embrace every kind of mental disease and disorder that renders a person not responsible for his acts.' Brackin v. State, 417 So.2d 602, 604 (Ala.Cr.App. 1982). Alabama Code Section 13A-3-2 (d) specifically provides that `[i]ntoxication in itself does not constitute mental disease or defect within the meaning of Section 13A-3-1' defining the defense of insanity. Here, there was no evidence that the defendant was not criminally responsible for the alleged conduct as a result of a mental disease or defect.
 "Voluntary intoxication is no defense to a charge of assault and battery, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Maddox v. State, 31 Ala. App. 332, 334, 17 So.2d 283
(1944). `Emotional insanity or temporary mania, usually due to causes such as intoxication, not associated with disease of the mind, does not constitute insanity.' Johnson v. State, 43 Ala. App. 224, 226, 18 So.2d 281 (1966). See also Beasley, supra; State v. Bullock, 13 Ala. 413 (1848). `[I]nsane conduct or mania resulting merely from present intoxication is not the insanity which excuses crime.' James v. State, 193 Ala. 55, 69 So. 569, 572 (1915). `Temporary insanity which arises from present voluntary intoxication is no defense to a criminal charge. . . . On the other hand, if the accused is suffering from a settled or fixed insanity, even though caused by long-continued alcoholic indulgence, the rule is the same as in the case of insanity arising from any other cause.' 21 Am.Jur.2d Criminal Law Section 54 (1981). See also Annot. 8 A.L.R.3d 1236 (1966)."
We cannot agree with appellant's application of Lister to the facts of the instant case.
In the instant case, there is absolutely no evidence to support a conclusion that appellant was suffering from a settled or fixed insanity. Therefore, under the facts of this case, the judge's remarks do not constitute reversible error.
For the foregoing reasons, this case is due to be, and it is hereby, affirmed.
AFFIRMED.
[1] While the record is unclear, it appears to us that Shirley Scofield is the same person who is sometimes referred to in the record as "Shirley Butts" and "Shirley McCullough."