The appellant, James Perkins, was convicted of four counts of capital murder for killing Wysteria Mathews and one count of attempted murder for shooting B.W., Mathews's 15-year-old cousin. Three of the capital-murder counts charged that Perkins committed the murder during the course of a first-degree burglary, see § 13A-5-40(a)(4), Ala. Code 1975, and one of the capital-murder counts charged that Perkins committed the murder "by or through the use of a deadly weapon fired or otherwise used from outside a dwelling while the victim is in a dwelling." See § 13A-5-40(a)(16), Ala. Code 1975. Because *Page 459 
the State did not seek to impose the death penalty, the jury was not asked to recommend a sentence. Following a sentencing hearing, the circuit court sentenced Perkins to a single sentence of life imprisonment without the possibility of parole for the capital-murder convictions, and to life imprisonment for the attempted-murder conviction.
The evidence at trial tended to establish the following. Perkins and the victim, Wysteria Mathews, lived together and had a child. In June 1998, Perkins was convicted of domestic violence in the City of Lincoln Municipal Court. Later that summer Wysteria and their three-year-old son moved back into her parents' mobile home on Harris Lane in Lincoln. On Saturday, October 10, 1998, Dolly and Melvin Mathews, Sr., Wysteria's parents, and the older Mathews children left for work, leaving three younger sons, a cousin, and Wysteria's son at home. Sometime that morning, Perkins telephoned the Mathews residence, looking for Wysteria. Wysteria's 12-year-old brother told Perkins that Wysteria was not home and that he did not know where she was. B.W. had spent the night at the Mathews residence; he also recalled a telephone call from Perkins in which Perkins was trying to locate Wysteria. Later that morning, Perkins came to the Mathews residence, again looking for Wysteria.
Around 1:00 p.m. that afternoon Wysteria returned to the Mathews residence. Wysteria was standing just inside the open doorway of the mobile home when B.W. heard two gunshots; the gunshots came from outside the mobile home. He saw Wysteria turn and begin to head into the living room. As she reached the living room she fell to the floor, as if she had been shot, screaming "get him away from me." Perkins then walked through the open door, armed with a rifle. B.W. and Wysteria's 15-year-old brother urged Perkins to put the gun down. Perkins said nothing and continued firing the weapon. He pointed the weapon at Wysteria and fired; he also pointed it at B.W. and fired. B.W. and Wysteria's 12-year-old brother escaped through the back door of the mobile home. The last thing B.W. remembered as he ran out of the mobile home was seeing Wysteria lying on the floor. He did not realize that he had been shot until after he got outside. Moments later, Perkins left the mobile home, got into Wysteria's car, and drove away.
Around 1:20 p.m. Lincoln police officers, together with the fire and rescue squad, responded to a report of a shooting at the Mathews residence. Wysteria exhibited no signs of life at the scene. B.W. and Wysteria were transported to the hospital in Talladega. B.W. underwent surgery and was discharged from the hospital six days later. Wysteria was pronounced dead at 2:20 p.m.
Meanwhile, Perkins had driven to his sister and brother-in-law's house. John Guyton, Perkins's brother-in-law, testified that Perkins drove up to their house about 1:35 p.m. Perkins told his brother-in-law to telephone the police because he had shot Wysteria. Guyton retrieved the weapon from Perkins and removed three bullets from it. Perkins also handed Guyton additional bullets that he removed from his pocket. When Talladega County Sheriff's Deputy Rita Chatman arrived at the Guyton residence, Guyton gave her the gun and bullets he had taken from Perkins. Deputy Chatman testified that she did not use force to take Perkins into custody. He simply walked up to her patrol vehicle, opened the door, and got inside. Perkins was charged with the capital murder of Wysteria Mathews and the attempted murder of B.W. While awaiting trial, Perkins underwent examination at Taylor *Page 460 
Hardin Secure Medical Facility to determine his competency to stand trial.
At trial, Willie Perkins, Perkins's nephew, testified that Perkins had borrowed a rifle from him about a week before the shooting. Willie testified that his uncle returned the gun to him, but that on the morning of October 10 he asked to borrow it again. Willie and a friend then drove Perkins to a Wal Mart discount store in Talladega, where Perkins purchased a box of shells for the rifle. Upon returning to Lincoln, Willie dropped Perkins off on Harris Lane around noon. The rifle Willie loaned to his uncle was subsequently determined to be the weapon that had been used to shoot Wysteria and B.W.
An autopsy performed on Wysteria revealed that she had been shot four times; once in the left arm and three times in the back. The autopsy report, prepared by Dr. Joseph Embry of the Department of Forensic Sciences, determined the cause of death as multiple gunshot wounds. Two other Department of Forensic Sciences employees, forensic technician Gerald Howard and deputy medical examiner Dr. Johnny Randall Glenn, concurred with the findings contained in the autopsy report.
The defense consisted of testimony from a single witness. Dr. John Goff, a neuropsychologist, testified after examining Perkins and reviewing all of his medical records, including the reports prepared at Taylor Hardin. Dr. Goff testified that Perkins suffered from a mental defect, namely, that he was "mildly mentally retarded." (R. 1071.) He stated that his findings were consistent with Perkins's medical history and that Perkins had first been diagnosed as mentally retarded while he was still in school. Based on the various tests, Perkins's IQ was determined to be in the range of 60-70. Dr. Goff stated that the mental retardation left Perkins "less able to deal with circumstances surrounding right and wrong." (R. 1076.) The State countered this testimony with evidence indicating that this was the first time Perkins had raised such a defense, despite his previous criminal convictions.[1]
At the close of all the evidence, the circuit court instructed the jury on the law applicable to Perkins's case, including the affirmative defense asserted by Perkins that he was not guilty by reason of mental disease or defect. The jury returned a verdict finding Perkins guilty of four counts of capital murder — three counts of burglary-murder and one count of murder committed by use of a firearm fired from outside a dwelling while the victim is inside the dwelling — and one count of attempted murder.
 I.
Perkins argues that his constitutional protection against double jeopardy was violated when he was tried and convicted of four counts of capital murder. Perkins was indicted for five counts of capital murder — counts one, two, and three charged him with murder committed during a first-degree burglary, count four charged him with murder committed during a second-degree burglary, and count five charged him with murder committed by means of a deadly weapon fired into a dwelling. Perkins was convicted of counts one, two, three, and five.[2] *Page 461 
Section 13A-7-5(a), Ala. Code 1975, provides, in pertinent part, as follows:
 "(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime:
"(1) Is armed with explosives or a deadly weapon; or
 "(2) Causes physical injury to any person who is not a participant in the crime; or
 "(3) Uses or threatens the immediate use of a dangerous instrument."
Here, count one of the indictment alleged that, while committing burglary-murder, Perkins "was armed with an explosive or deadly weapon." Similarly, count two alleged that, while committing the burglary-murder, Perkins "did cause physical injury to [B.W.], who was not a participant in the said crime." Finally, count three alleged that, while committing the burglary-murder, Perkins "did use or threaten the immediate use of a dangerous instrument."
In Wynn v. State, 804 So.2d 1122 (Ala.Crim.App. 2000), cert. denied, 804 So.2d 1152 (Ala. 2001), this Court addressed a factually similar situation. There, the defendant was indicted and convicted of two counts of robbery-murder and two counts of burglary-murder. In Wynn,"Count III alleged that, while committing the burglary-murder, the appellant `did use or threaten the immediate use of a dangerous instrument,' and Count IV alleged that, while committing the burglary-murder, the appellant `did cause physical injury to Denise Bliss.'"804 So.2d at 1149. We held that the two counts allowed him to be convicted twice for the same offense, a violation of the Double Jeopardy Clause. This Court stated:
 "Counts III and IV were simply alternative methods of proving the single offense of burglary-murder. We addressed a similar situation in Stewart v. State, 601 So.2d 491, 494-95 (Ala.Crim.App. 1992), aff'd in part, rev'd in part on other grounds, 659 So.2d 122
(Ala. 1993), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101
(1999), and held:
 "`The six indictments show that the appellant was charged with four counts of intentional murder during the course of a burglary and with two counts of murder during the course of a kidnapping. In fact, the prosecutor alluded to the fact that the indictments were alternative ways of charging the appellant after the court's dialogue above. The four indictments charging murder during the course of a burglary merely detailed alternative ways of proving the elements of burglary. The two indictments charging murder during the course of a kidnapping alleged alternative methods of establishing the crime of kidnapping. We realize that "the purpose of the [alternative] counts was not to charge two or more separate offenses, but to vary the description of one and the same offense based upon one and the same transaction." Floyd v. State, 486 So.2d 1309, 1313
(Ala.Cr.App. 1984), aff'd, 486 So.2d 1321 (Ala. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987). However, we do not have here a case like Floyd. In Floyd, the appellant was not convicted of all eight counts of capital murder but was convicted of *Page 462 
only one count of capital murder. In the present case, the appellant was convicted on all six counts of capital murder. We do agree with the court in Floyd that the state would not have been required to elect which alternative counts under § 13A-5-40(a)(1) and § 13A-5-40(a)(4) would be presented to the jury. Alternative methods of proving the same crime "[do] not constitute separate offenses." Ex parte State [Sisson v. State], 528 So.2d 1159, 1162 (Ala. 1988). However, the appellant's conviction on all six alternative counts cannot stand. Thus, according to Sisson, the convictions on three counts of murder during the course of a burglary and on one count of murder during the course of kidnapping must be vacated. A person cannot be convicted for the same crime twice because to do so would violate the principles of double jeopardy. Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990); Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). (For an in depth discussion applying the principles of Sisson and Blockburger to facts similar to those in this case, see Judge Bowen's special concurrence opinion in King v. State, 574 So.2d 921 (Ala.Cr.App. 1990).)'"
804 So.2d at 1149-50. Accord Living v. State, 796 So.2d 1121,1143-44 (Ala.Crim.App. 2000).
Here, just as in Wynn and Living, counts one, two, and three were simply alternative methods of proving the single offense of capital murder committed during a burglary. Even though Perkins received but a single sentence for all of the capital-murder convictions, the mere fact that he was convicted of three counts of burglary-murder violates the Double Jeopardy Clause. See Living v. State, 796 So.2d at 1144; Knight v.State, 675 So.2d 487, 496-97 (Ala.Crim.App. 1995). Accordingly, Perkins's conviction as to all three counts violated the Double Jeopardy Clause. However, because count five contained an element not found in counts one, two, or three, Perkins's conviction for murder committed by means of a deadly weapon fired from outside a dwelling while at a victim inside the dwelling does not violate the prohibition against double jeopardy. See Ex parte Dixon,804 So.2d 1075, 1078-79 (Ala. 2000).
For the reasons set forth above, the convictions on three alternative counts of burglary-murder cannot stand. However, one conviction for burglary murder has been proven and may stand. Accordingly, this case must be remanded for the circuit court to vacate two of Perkins's convictions for burglary-murder.
 II.
Perkins next argues that the circuit court erred in admitting into evidence an autopsy report prepared by Dr. Joseph Embry, who had retired and was unavailable to testify, and by allowing other personnel from the Alabama Department of Forensic Sciences to testify as to conclusions and opinions based on Dr. Embry's report. The court's action, Perkins argues, violated his rights under the Confrontation Clause to the Sixth Amendment of the United States Constitution and denied him the right to a fair trial.
During trial, the State advised the circuit court that it would present Dr. Embry's assistant, forensic technician Gerald Howard, to testify regarding the victim's autopsy because Dr. Embry was not available for trial. The State advised the court that Dr. Embry had retired and at the time of trial was out of the State on vacation. Howard had assisted Dr. Embry *Page 463 
during the autopsy. Thereafter, over defense counsel's objection, Howard testified regarding the victim's wounds. During his testimony, Howard referred to the photographs taken during the autopsy, as well as to Dr. Embry's report. Howard stated that based on the report Dr. Embry had concluded that three of the four gunshot wounds suffered by the victim would have been fatal. Howard further stated that he concurred with Dr. Embry's findings, and that those findings were consistent with what he had observed during the autopsy. Dr. Johnny Randall Glenn, a medical examiner employed by the Department of Forensic Sciences, testified that Dr. Embry's report was an established business record kept in the ordinary course of business by the Department of Forensic Sciences. Based on his review of the autopsy report and photographs, Dr. Glenn testified that in his opinion the cause of the victim's death was multiple gunshot wounds.
The Confrontation Clause, contained in the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In Ohio v. Roberts,448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court established a two-part analysis for determining whether certain testimony violates the Confrontation Clause; this analysis focuses on the necessity and reliability of the testimony. This Court discussed that standard in Grantham v.State, 580 So.2d 53 (Ala.Crim.App. 1991):
 "`In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court "announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony." United States v. Perez, 658 F.2d 654
at 660 (9th Cir. 1981) (citing Roberts, 448 U.S. at 65-66, 100 S.Ct. at 2538-39). The first consideration is the "rule of necessity" established by the sixth amendment. Roberts, 448 U.S. at 65, 100 S.Ct. at 2538. "In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." Id. This necessity requirement is not "absolute." Perez, 658 F.2d at 661. The government is not required to produce a seemingly available witness when the "utility of trial confrontation [is] remote." Roberts, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Furthermore, "[t]estimony that is neither `crucial' to the prosecution nor `devastating' to the defendant might not be subject to the necessity requirement." Perez, 658 F.2d at 661 (citing Dutton v. Evans, 400 U.S. 74 at 87, 89, 91 S.Ct. 210 at 219, 220, 27 L.Ed.2d 213 (1970)). If the government establishes the unavailability of the witness, Roberts then requires that the declarant's statement bear adequate "indicia of reliability." Roberts, 448 U.S. at 66, 100 S.Ct. at 2539.'"
580 So.2d at 55-56 (quoting United States v. McClintock,748 F.2d 1278, 1291-92 (9th Cir. 1984), cert. denied, 474 U.S. 822,106 S.Ct. 75, 88 L.Ed.2d 61 (1985)). After the decision inGrantham, the United States Supreme Court further refined its holding in Ohio v. Roberts, appearing to reject the "unavailability" prong of the Ohio v. Roberts test. See UnitedStates v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390
(1986), and White v. Illinois, 502 U.S. 346, 112 S.Ct. 736,116 L.Ed.2d 848 (1992). Despite these holdings, however, Alabama courts continued to apply the two-part analysis used in Ohio v.Roberts when reviewing Confrontation Clause issues. See, e.g.,Ex parte Scroggins, *Page 464 727 So.2d 131 (Ala. 1998); Withee v. State, 728 So.2d 684 (Ala.Crim.App. 1998); Barnes v. State, 704 So.2d 487 (Ala.Crim.App. 1997).[3]
Recently, however, the United States Supreme Court revisited its holding in Ohio v. Roberts. In Crawford v. Washington,541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the admission of a wife's out-of-court statements to police officers, regarding an incident in which the defendant, her husband, allegedly stabbed the victim, violated the Confrontation Clause. The Supreme Court stated that an out-of-court statement by a witness that is testimonial is barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statement is deemed reliable by the trial court, abrogating its previous holding in Ohio v. Roberts. While the Supreme Court applied a stricter standard to the admission of testimonial hearsay, however, it did not do so with regard to nontestimonial hearsay, noting:
 "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."
541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.
Unlike the hearsay in Crawford v. Washington, the hearsay at issue in this case is nontestimonial in nature — an autopsy report on the victim, Wysteria Mathews. As the Court noted in White:
"[w]here [the] proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." 502 U.S. at 356,112 S.Ct. 1360.
Both Alabama and federal caselaw have recognized that the business records exception is a firmly rooted exception to the hearsay rule. See, e.g., McNabb v. State, 887 So.2d 929, 969
(Ala.Crim.App. 2001); Ohio v. Roberts, 448 U.S. at 66 n. 8,100 S.Ct. 2531. Moreover, under Alabama law, "An autopsy report made in the regular course of business is admissible under the business records exception." 2 Charles W. Gamble, McElroy'sAlabama Evidence § 254.01(18) (5th ed. 1996) (footnote omitted). See also Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003); Baker v. State,473 So.2d 1127, 1129 (Ala.Crim.App. 1984). The results of Dr. Embry's autopsy and the supporting materials are business records, which bear the earmark of reliability or probability of trustworthiness and further the "`integrity of the fact-finding process,'" seeCoy v. Iowa, 487 U.S. 1012, 1020, 108 S.Ct. 2798,101 L.Ed.2d 857 (1988) (quoting Kentucky v. Stincer, 482 U.S. 730, 736,107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)); because this evidence satisfies the core value of the Confrontation Clause, the State did not have to establish Dr. Embry's unavailability.
As seen from the evidence set out above, there was no question that the cause of the victim's death was a gunshot wound. Nor, given the eyewitness testimony, was there any question that Perkins was the person who shot the victim. Indeed, Perkins's defense was that he was not guilty by *Page 465 
reason of mental disease or defect, based on his mental retardation. Perkins has submitted nothing to suggest that had he had the opportunity to cross-examine Dr. Embry, Dr. Embry would have changed his opinion as to the cause of Wysteria's death. We fail to see how Dr. Embry's presence would have added to the "fact-finding process." Nor do we believe that the autopsy report as presented through the testimony of Howard and Glenn was a factor in the jury's rejection of Perkins's mental-defect defense.[4]
Moreover, even if the introduction of the autopsy report without Dr. Embry's testimony was error, the error would be harmless. As this Court noted in Grantham v. State:"Violations of the confrontation clause are, like many other constitutional errors, subject to a harmless error analysis." 580 So.2d at 58
(citing Delaware v. Van Arsdall, 475 U.S. 673, 680-84,106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)); see also Withee v. State,728 So.2d at 688. Even without the autopsy report, the evidence presented by the State was sufficient on which to base a finding that Perkins was guilty of capital murder. Admission of the autopsy report through the testimony of Howard and Glenn did not affect the jury's conclusion that Perkins killed Wysteria Mathews. The admission of the report, even if error, was harmless beyond a reasonable doubt. Thus, no basis for reversal exists as to this issue.
 III.
Perkins also argues that there was insufficient evidence to sustain his conviction for the attempted murder of B.W., because, he says, there was no evidence indicating that he intended to murder B.W. Perkins preserved this issue for review by moving for a judgment of acquittal at the conclusion of the State's case-in-chief.
"The elements of the crime of attempted murder are intent to kill and an overt act towards commission of that act." Bradfordv. State, 734 So.2d 364, 369 (Ala.Crim.App. 1999) (citingChaney v. State, 417 So.2d 625 (Ala.Crim.App. 1982)). InOryang v. State, 642 So.2d 979 (Ala.Crim.App. 1993), this Court reviewed whether the State had established sufficient evidence to sustain the defendant's conviction for attempted murder. We noted:
 "`Evidence to prove intent need not be direct, but may be circumstantial. Johnson [v. State, 390 So.2d 1160, 1166-67 (Ala.Cr.App.), writ denied, 390 So.2d 1168 (Ala. 1980)]. "Because the element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances." Johnson, supra, at 1167; Tucker v. State, 383 So.2d 579 (Ala.Cr.App. 1980), writ denied, 383 So.2d 586 (Ala. 1980).'"
Oryang v. State, 642 So.2d at 988 (quoting Benton v. State,536 So.2d 162, 164 (Ala.Crim.App. 1988)). Accord Bradford v.State, 734 So.2d at 369; Jones v. State, 591 So.2d 569, 574
(Ala.Crim.App. 1991); Free v. State, 495 So.2d 1147, 1158
(Ala.Crim.App. 1986); Chaney v. State, 417 So.2d at 627. *Page 466 
Here, B.W. testified that on the afternoon of October 10, 1998, Perkins came to the mobile home of Dolly and Melvin Mathews looking for his girlfriend, Wysteria Mathews. B.W. testified that he heard gunshots from outside the mobile home, and then saw Wysteria run away from the door and toward the living room, where she fell to the floor as if she had been shot. B.W. then saw Perkins enter the mobile home, armed with a rifle, and walk toward Wysteria. B.W. testified that he and one of Wysteria's brothers urged Perkins to put down the rifle. Perkins ignored them and continued to fire the rifle. B.W. testified that at some point Perkins pointed the rifle at him and fired; however, B.W. did not realize that he had been shot until after he ran outside. He then saw Perkins leave the mobile home, get into Wysteria's car, and drive away.
 "`In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App. 1984), aff'd, 471 So.2d 493
(Ala. 1985). Where, moreover, the State establishes a prima facie case, conflicting evidence presents a jury question which is not subject to review on appeal. Willis v. State, 447 So.2d 199, 201
(Ala.Cr.App. 1983)."
Barnes v. State, 571 So.2d 372, 374 (Ala.Crim.App. 1990). Although conflicts in the State's evidence existed, the State's evidence, when taken as a whole, could have permitted the jury to reasonably conclude that Perkins shot B.W. with the intent to murder him. See, e.g., Oryang v. State, 642 So.2d at 988. Thus, the circuit court correctly denied Perkins's motion for a judgment of acquittal and submitted the question of his guilt on the attempted-murder charge to the jury.
 Conclusion
For the reasons set forth in Part I of this opinion, Perkins's convictions on three alternative counts of burglary-murder cannot stand. However, one conviction for burglary-murder has been proven and may stand. Accordingly, we remand this case to the circuit court with instructions that it vacate two of Perkins's burglary-murder convictions. On remand the court shall take all necessary action to see that the circuit court makes due return to this Court at the earliest possible time and within 42 days of the release of this opinion.
AFFIRMED IN PART; REMANDED WITH DIRECTIONS.*
McMILLAN, P.J., and COBB and BASCHAB, JJ., concur. SHAW, J., concurs in part and concurs in the result in part, with opinion.
[1] The record indicates that Perkins had a number of previous criminal convictions. Only one of the convictions was for a felony offense, third-degree burglary; the remaining convictions involved either traffic violations or misdemeanor offenses.
[2] The circuit court charged the jury that if it found Perkins guilty of murder during a first-degree burglary, then it could not consider the murder-during-a-second-degree-burglary charge. Following the jury's verdict, the court dismissed the charge of capital murder committed during a second-degree burglary.
[3] For a more detailed discussion of this inconsistency, together with the effect of Crawford v. Washington, see Smithv. State, [Ms. CR-02-1218, April 30, 2004] ___ So.2d ___, ___ (Ala.Crim.App. 2004).
[4] We note that our decision is consistent with previous decisions in which Alabama courts have upheld the admission of expert testimony based on the report of an unavailable forensic expert witness through another expert witness employed by the Department of Forensic Sciences without addressing the Confrontation Clause issue. See, e.g., Henderson v. State,583 So.2d 276, 290-91 (Ala.Crim.App. 1990), aff'd, 583 So.2d 305
(Ala. 1991).
* Note from the reporter of decisions: On June 18, 2004, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On July 30, 2004, that court denied rehearing, without opinion. On September 17, 2004, the Supreme Court denied certiorari review, without opinion (1031755).